[Civ. No. 63482. Second Dist., Div. Five. Apr. 26, 1983.]

PALOS VERDES SHORES MOBILE ESTATES, LTD.,
Plaintiff and Respondent, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

COUNSEL

Ira Reiner, City Attorney, Gary R. Netzer and Claudia McGee Henry, Assistant City Attorneys, for Defendants and Appellants.

Tuttle & Taylor, Joseph R. Austin, William C. Schweinfurth, David B. Babbe, Ervin, Cohen & Jessup, Allan Browne, Gary H. Amsterdam and Leonard G. Ratner for Plaintiff and Respondent.

OPINION

**FEINERMAN, P. J.**—Appellants, City of Los Angeles, the Community Development Department of the City of Los Angeles and the rent adjustment commission (hereafter collectively referred to as City), appeal from an order granting a preliminary injunction under the terms of which the City is enjoined from enforcing its Rent Stabilization Ordinance (Ord. No. 152,120, §§ 151.00-151.19) as to respondent Palos Verdes Shores Mobile Estates, Ltd. (PVS). The preliminary injunction was based upon a partial summary judgment which declared the following issues to be without controversy:

(1) That the "Rent Increase Guidelines for 'Just and Reasonable'" (guidelines) as promulgated by the rent adjustment commission pursuant to the rent stabilization ordinance "are invalid on their face and void under Article I, Sections 7 and 15, of the California Constitution[1] and the Fourteenth Amendment of the United States Constitution;" and

---

[1]Article I, section 7 encompasses the state due process and equal protection provisions. Article I, section 15 pertains to a defendant's rights in a criminal case.

(2) That "[i]n the absence of valid guidelines, the Rent Stabilization Ordinance of the City of Los Angeles is also invalid on its face and void under Article I, sections 7 and 15, of the California Constitution and the Fourteenth Amendment of the United States Constitution."[2]

In support of its order granting partial summary judgment the trial court found as follows:

"2. The Stabilization Ordinance itself provides no standard as to what constitutes a just and reasonable return on the property of affected landlords; rather, the Stabilization Ordinance delegates to a Rent Adjustment Commission the responsibility both to set such a standard and to formulate an individual rent adjustment mechanism. Ordinance No. 152,120, Sec. 151.07.

"3. The guidelines adopted by the Rent Adjustment Commission pursuant to the Stabilization Ordinance fail to satisfy due process standards because: (1) they do not articulate a reasonably ascertainable standard for determining a just and reasonable return, and (2) such standards as the guidelines may have intended to articulate will not, in their application to all landlords, avoid confiscatory results."

We find that the trial court erred in ruling that the City of Los Angeles Rent Stabilization Ordinance is unconstitutional. We disagree with the trial court's interpretation of the ordinance and find that the ordinance provides both sufficient standards for the guidance of the rent adjustment commission and a constitutionally adequate rent adjustment medium.

### The Ordinance

The Rent Stabilization Ordinance took effect on May 1, 1979 , after expiration of the City's interim rent control ordinance (No. 151,415) on April 30, 1979. The stated purpose of the ordinance is "to regulate rents so as to safeguard tenants from excessive rent increases, while at the same time providing landlords with just and reasonable returns from their rental units." (§ 151.01.)

"Maximum Rent" under the ordinance is defined as the maximum legal monthly rent in effect for each rental unit under the former interim rent control ordinance. (§ 151.02, subsec. I.) "Maximum Adjusted Rent" is de-

---

[2]In a "modified second order declaring that issue is without controversy" the trial court held that the amended "Just and Reasonable Guidelines" published on March 3, 1981, were also "invalid on their face and void under Article I, Sections 7 and 15 of the California Constitution and the Fourteenth Amendment of the United States Constitution."

fined as "The maximum rent plus any rent increases subsequently made or granted pursuant to Sections 151.06, 151.07, or 151.08 . . . ." (§ 151.02, subsec. H.)

Under section 151.06, a landlord may automatically increase the maximum rent for a rental unit seven percent each year without securing the permission from the rent adjustment commission or the community development department.[3]

Under section 151.07, subsection A, the community development department has authority to grant adjustments in rent for rental units where the landlord shows:

1. It has "completed a capital improvement[4] with respect to a rental unit and has not increased the rent to reflect the cost of such improvement";

2. It has "completed rehabilitation work[5] with respect to a rental unit and has not increased the rent to reflect the cost of such work"; or

3. "That the rental unit or units were purchased utilizing an escrow entered into between January 1, 1978, and October 1, 1978; the landlord has not been able to increase the rent on the unit or units since October 1, 1978; and as a result the maximum rent is not equitable under the circumstances."

In addition to these provisions for automatic and semiautomatic rent increases, section 151.07, subsection B, gives authority to a designated hearing officer "in accordance with such guidelines as the Commission [Rent Adjustment Commission] may establish" to grant rent increases based on a landlord's application where the hearing officer finds "that such increase is in keeping with the purposes of this Chapter and that the maximum rent or maximum adjusted rent otherwise permitted pursuant to this Chapter *does not constitute a*

---

[3]Section 151.06 also provides for an automatic rent increase of 19 percent for a rental unit which had not had a rent increase since May 31, 1976, and a 13 percent increase for a rental unit which had not had a rent increase since May 31, 1977. Section 151.06 also provided that if a rental unit was vacated voluntarily, or as a result of an eviction or termination of tenancy, as allowed by section 151.09, the rent could be increased to any amount upon rerental of the unit.

[4]"Capital improvement" is defined under the statute as "The addition or replacement of the following improvements to a rental unit or common areas of the housing complex containing the rental unit, provided such new improvement has a useful life of five years or more: roofing, carpeting, draperies, stuccoing the outside of a building, air conditioning, security gates, swimming pool, sauna or hot tub, fencing, garbage disposal, washing machine or clothes dryer, dishwasher, children's play equipment permanently installed on the premises, and other similar improvements as determined by the Commission." (§ 151.02, subsec. C.)

[5]"Rehabilitation Work" *is defined* under the statute as: "Any rehabilitation or repair work done on or in a rental unit or common areas of the housing complex containing the rental unit and which work was done in order to comply with an order issued by the Department of Building and Safety, the Health Department, or the Fire Department, or to repair damage resulting from fire, earthquake or other natual disaster." (§ 151.02, subsec. J.)

*just and reasonable return on the rental unit or units.*" (Italics added.) Thereafter, the ordinance sets forth certain nonexclusive factors to be considered in determining whether a rental unit yields a just and reasonable return, including, but not limited to: "a. property taxes; b. reasonable operating and maintenance expenses; c. the extent of capital improvements made to the building in which the rental unit is located as distinguished from ordinary repair, replacement and maintenance; d. living space, and the level of housing services;[6] e. substantial deterioration of the rental units other than as a result of ordinary wear and tear; and f. failure to perform ordinary repair, replacement and maintenance."[7]

The statute sets forth a procedure for application, notice, hearing and decision by the hearing officer as to landlord applications for a rental increase where it is claimed that rent increases permitted by other provisions of the ordinance are insufficient to constitute a just and reasonable return. The ordinance also provides for a subsequent appeal to the full rent adjustment commission from the determination of the hearing officer.

Finally, the ordinance gives the rent adjustment commission authority to regulate rents by categories of rental units. The ordinance provides that the commission "may make such adjustments, either upward or downward, of the maximum rent or maximum adjusted rent for any class of rental units as it determines are appropriate to carry out the purposes of this Chapter. For the purposes of this section, the phrase 'class of rental units' may include all rental units or certain categories of rental units based on such common characteristics as the Commission may determine, including size, age, construction, rent, or geographic area."[8] (§ 151.08.)

---

[6]"Housing Services" are defined under the ordinance as "Services connected with the use or occupancy of a rental unit including but not limited to, utilities (including light, heat, water and telephone), ordinary repairs or replacement, and maintenance including painting. This term shall also include the provision of elevator service, laundry facilities and privileges, common recreational facilities, janitor service, resident manager, refuse removal, furnishing, parking, and any other benefits, privileges or facilities."

[7]There is also an antispeculation provision to be considered in determining whether a rental unit yields a just and reasonable return. That provision is as follows: "If the only justification offered for the requested rent increase on the landlord's application is an assertion that the maximum rents or maximum adjusted rents permitted pursuant to this Chapter do not allow the landlord a return sufficient to pay both the operating expenses and debt service on the rental unit or units or on the housing complex containing the rental unit or units, a rent adjustment will not be permitted pursuant to this subsection to a landlord who acquired an interest in the rental unit or units after October 1, 1978."

[8]Section 151.08 also empowered the commission to promulgate regulations concerning: (1) reductions in rent where there is a corresponding reduction of housing services (see fn. 6, *ante*; (2) increases in rent where rental units regularly experience seasonal fluctuations in occupancy; (3) standards for increases and decreases relating to "the improvement, reduction or deterioration in housing services or facilities, or to increases or decreases in operating expenses and taxes."

The only issues presented on this appeal are whether the Los Angeles Rent Stabilization Ordinance is constitutional on its face and whether the administrative guidelines promulgated thereunder are valid. The question of whether the statute and guidelines are constitutional, as applied, presents questions of fact which have not as yet been ruled upon by the trial court.[9]

 Since the determination of the facial validity of an ordinance presents an issue of law, it is appropriate that the issue be settled on an appeal from an order granting a preliminary injunction enjoining the ordinance's enforcement. (*City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219]; *North Coast Coalition* v. *Woods* (1980) 110 Cal.App.3d 800, 805 [168 Cal.Rptr. 95].)

DISCUSSION

I. *Due Process*

 In California, the constitutionality of a rent control ordinance is determined pursuant to the guidelines articulated by the California Supreme Court in *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 159 [130 Cal.Rptr. 465, 550 P.2d 1001]. In *Birkenfeld,* the court held that rent control legislation is constitutionally valid as a proper exercise of the police power so long as the legislation is "reasonably calculated to eliminate excessive rents and at the same time provide landlords with a just and reasonable return on their property." (*Id.,* at p. 165.)

The Los Angeles Rent Stabilization Ordinance differs substantially from the Berkeley charter amendment struck down by the Supreme Court in *Birkenfeld.*

As previously noted, maximum rents under the Los Angeles ordinance are set at the maximum allowed under the interim rent control ordinance (No. 151,415) in effect in Los Angeles from October 1, 1978, to April 30, 1979. However, maximum rents are not rigidly held there, subject only to change by application on the part of an individual landlord, as was the case in *Birkenfeld.* Under the Los Angeles ordinance, landlords are permitted to increase rents 7-9 percent annually. The ordinance also provides that rents on vacated units may be increased to any amount. On application to the community development department, landlords are allowed to increase rents based on capital improve-

---

[9]In ruling on the motion for partial summary judgment, the trial court first denied the motion, ruling that the ordinance was constitutional and holding that there were factual issues involved in determining whether the ordinance was constitutional as applied. On reconsideration, the trial court rules that the ordinance was unconstitutional on its face.

ment costs, special assessment costs and rehabilitation work costs. Luxury apartments[10] are exempted from all rent control. (§ 151.02, subsec. M, 7.)

Finally, in cases where, in spite of the automatic and semiautomatic rent increases allowed under the ordinance, a landlord still believes he is not receiving a just and reasonable return on his property, the commission has authority to grant individual rent adjustments.

■ We believe the trial court erred when it determined that the ordinance lacked sufficient standards to govern its administration. The general standard set forth in the ordinance is to "safeguard tenants from excessive rent increases but at the same time provide landlords with just and reasonable returns from their rental units." The trial court held that because neither the ordinance nor the guidelines promulgated under the ordinance set forth sufficient standards for determining just what constitutes a just and reasonable return on property, the ordinance was unconstitutional. We disagree with the trial court's analysis.

The Berkeley charter amendment considered in *Birkenfeld* said nothing specific about insuring a just and reasonable return on property. Rather, the amendment provided a general statement of purpose and a list of relevant but not exclusive factors to be considered by the board in deciding whether to grant individual applications for increases in rent. In answer to a contention of improper delegation of legislative power, the Supreme Court stated (17 Cal.3d at pp. 168-169): " 'The rule that the statute must provide a yardstick to define the powers of the executive or administrative officer is easy to state but rather hard to apply. Probably the best that can be done is to state that the yardstick must be as definite as the exigencies of the particular problem permit.' [Citation.] By stating its purpose and providing a nonexclusive illustrative list of relevant factors to be considered, the charter amendment provides *constitutionally sufficient legislative guidance to the Board for its determination of petitions for adjustments of maximum rents. . . .*" The court also stated, "Here the charter amendment's purpose of counteracting the ill effects of 'rapidly rising and exorbitant rents exploiting [the housing] shortage' (§ 1.) implies a standard of fixing maximum rent levels at a point that permits the landlord to charge a just and reasonable rent and no more. [Citation.]" (*Ibid.* Italics added.)

In the case before us, we need not imply a constitutionally adequate standard, for the ordinance itself declares its purpose to curb excessive rents while at the same time ensuring landlords a "just and reasonable return." The provisions for automatic and semiautomatic rent increases, and the provisions empowering

[10]Luxury housing accommodations are defined in the ordinance as those "wherein as of May 31, 1978, the rent charged per month was at least $302 for a unit with no bedrooms; $420 for a unit with one bedroom; $588 for a unit with two bedrooms; $756 for a unit with three bedrooms; and $823 for a unit with four bedrooms or more."

the commission to grant increases with respect to certain classes of rental units are reasonably designed to ensure landlords a just and reasonable return.

Failing relief under those provisions, individual landlords are allowed to make applications for rent increases which, under the ordinance, are to be granted if it is found that the "increase is in keeping with the purposes" of the ordinance and that the rent levels otherwise allowed do not constitute a just and reasonable return on the rental unit or units. In making this determination, the hearing officer is guided by a list of nonexclusive but relevant factors. In our studied judgment, the standards set forth in the ordinance, considered as a whole, pass the litmus test for constitutionality delineated in *Birkenfeld*.

PVS argues that the just and reasonable standard set forth in *Birkenfeld* should be interpreted as requiring that rent control legislation must guarantee landlords a fair return on the present fair value of their property. PVS relies on government price regulation cases such as *Smyth* v. *Ames* (1898) 169 U.S. 466 [42 L.Ed. 819, 18 S.Ct. 418]; *Market St. Ry. Co.* v. *Railroad Com.* (1944) 24 Cal.2d 378 [150 P.2d 196]; and *Contra Costa Water Co.* v. *Oakland etc.* (1911) 159 Cal. 323 [113 P. 668] among others. We find nothing in *Birkenfeld* that would mandate such an interpretation of the just and reasonable standard. In public utility rate regulation cases, the United States Supreme Court has held that, "The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas." (*Power Comm'n.* v. *Pipeline Co.* (1942) 315 U.S. 575, 586 [86 L.Ed. 1037, 1049-1050, 62 S.Ct. 736].) In *Power Comm'n* v. *Hope Gas Co.* (1944) 320 U.S. 591 [88 L.Ed. 333, 64 S.Ct. 281], the Supreme Court considered legislation calling for "just and reasonable" gas rates, but which provided no express formula by which the "just and reasonable" rate was to be determined. The circuit court had reversed a commission order setting rate bases because it determined the rate base should reflect the "present fair value" of the gas company property. The court stated (320 U.S. at pp. 601-602 [88 L.Ed. at p. 344]): "The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid. [Citations.] It does, however, indicate that 'fair value' is the end product of the process of rate making not the starting point as the Circuit Court of Appeals held. The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated."

We also note that the fair return on present fair value of property formula has been expressly rejected in some rent control cases. In *Helmsley* v. *Borough of Fort Lee* (1978) 78 N.J. 200 [394 A.2d 65 at page 72], the court stated, "After considering the massive record compiled by plaintiffs, we are satisfied that a

value-based criterion for confiscation under rent control is practically un-
workable." (See *Wilson* v. *Brown* (E.C.A. 1943) 137 F.2d 348.)

The administrative guidelines[11] promulgated by the rent adjustment commis-
sion, which are to be used by hearing officers for determining a just and
reasonable return, are designed to guarantee landlords at least the same rate of
return, with adjustments for inflation, that they experienced prior to the enact-
ment of rent control. This approach is termed the "maintenance of profit ap-
proach," "historic return approach," or "fair operating income approach."
Pursuant to the guidelines, hearing officers may grant increases in rent where
the maximum rent or adjusted maximum rent allowed to a landlord under the
ordinance does not constitute a just and reasonable return. A just and
reasonable return under the guidelines is that level of rent necessary to enable
the landlord to maintain the same net profit as obtained in the last year there was
an unregulated housing market. The standard enunciated in the guidelines is as
follows:

". . . In most cases, the automatic increases allowed by the Ordinance and
the property tax savings resulting from Proposition 13 provide sufficient addi-
tional operating income to landlords to maintain the same net operating income
they experienced in 1977. However, in some cases landlords may have in-
curred reasonable operating expenses which exceed the rent increases allowed
by the Ordinance and the tax savings resulting from Proposition 13. Therefore,
landlords who have had such reasonable increased operating expenses shall be
able to maintain the same level of net operating income as they experienced in
1977 with a *Price Level Adjustment* determined by the Commission from time
to time." (§ 240.03.)

A landlord who is dissatisfied with a hearing officer's determination is al-
lowed an appeal to the Rent Adjustment Commission. The administrative
guidelines provide that error by a hearing officer may be established in one of
the following ways:

"a) by showing that the Hearing Officer failed to apply the Guidelines or
Regulations properly; or

"b) by showing that the use of any base year required by this Guideline
would result in an unreasonably low *Net Operating Income* which was not the
result of self-imposed hardship and that a rent increase above that authorized by
the Hearing Officer would be consistent with the purposes of the Rent Stabiliza-
tion Ordinance." (§ 248.03.)

---

[11]We restrict our review to the amended "Just and Reasonable Guidelines" published on
March 3, 1981, since the amended guidelines superseded the original guidelines and were also
pronounced unconstitutional by the trial court.

The "maintenance of profit approach" provided for in the administrative guidelines is a reasonable means for accomplishing the legitimate governmental purpose of ensuring a just and reasonable return. With respect to the question of facial constitutionality of the legislative scheme, our inquiry need go no further. (*Block* v. *Hirsh* (1920) 256 U.S. 135, 158 [65 L.Ed. 865, 872, 41 S.Ct. 458, 16 A.L.R. 165].)

Accordingly, we conclude that the rent adjustment procedures set forth in the City's Rent Stabilization Ordinance and guidelines are sufficient to avoid the pitfalls and confiscatory results comdemned by the Supreme Court in the Berkeley legislation considered in *Birkenfeld*.

## II. *Equal Protection*

PVS contends that the exclusion of mobilehomes from the luxury accommodation exemption deprives it of equal protection of the laws. As noted previously, luxury housing accommodations, as defined in the ordinance (see fn. 10, *ante*), are exempted from rent control; but the ordinance specifically states, "This exemption shall not apply to mobile homes." The standard for assessing a claim of denial of equal protection is set forth in *Mathews* v. *Workmens' Comp. Appeals Bd.* (1972) 6 Cal.3d 719, 738-739, [100 Cal.Rptr. 301, 493 P.2d 1165] as follows: "[T]he Constitution does not require uniform treatment, only a reasonable basis for legislative classification. [Citation.] It is the duty of the Legislature to determine whether the facts justify such a classification and the burden of the challenger to show that the legislative conclusion is arbitrary. [Citation.] As we said in *Sacramento M. U. Dist.* v. *P. G. & E. Co.* (1942) 20 Cal.2d 684, 693 [128 P.2d 529]: 'Wide discretion is vested in the Legislature in making the classification and every presumption is in favor of the validity of the statute; the decision of the Legislature as to what is a sufficient distinction to warrant the classification will not be ovethrown by the courts unless it is palpably arbitrary and beyond rational doubt erroneous. [Citations.] A distinction in legislation is not arbitrary if any set of facts reasonably can be conceived that would sustain it.' We presume the legislative classification is valid and will sustain it 'unless it is manifestly without support in reason.' [Citation.]"

There is a rational basis for treating mobilehomes different from other rental housing when providing an exemption for luxury accommodations. The distinction is based on the fact that in the apartment rental housing market, as a general rule, the amount of rent charged for each individual unit in a particular housing complex depends mainly upon the number of bedrooms and the size and ambience of the apartment. The typical mobilehome park tenant owns his own mobilehome unit, makes mortgage and tax payments on that home, and pays rent for the mobilehome site to the mobilehome park. There are a wide variety

of rental practices in mobilehome parks. Kathleen Marie Connell, Director of Housing for the City of Los Angeles, testified: "Some owners charge all tenants the same irrespective of the size of the mobile home. Others charge a modest premium for a double width unit or for extra length, a few charge for corner locations, and some charge extra for a better view. In any case, whereas apartment rentals follow a rental pattern based on the size of the unit, no similar common pattern could be found in the renting of ground spaces in mobile home parks."

Where two groups are not "similarly situated," the difference can form a rational basis for different treatment. (See *In re Antazo* (1970) 3 Cal.3d 100, 110 [89 Cal.Rptr. 255, 473 P.2d 999].) Since there is no clear-cut correlation between rents charged and the size and nature of the mobilehome and the number of bedrooms contained therein, there was a rational basis for excluding mobilehomes from the luxury accommodation exemption.

### III. *Preemption*

PVS contends that the Mobilehome Residency Law (Civ. Code § 798 et seq.) preempts local regulation of rents in mobilehome parks.

Article XI, section 7 of the California Constitution provides that, "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." There is no express conflict between the Los Angeles Rent Stabilization Ordinance and the Mobilehome Residency Law. However, a local ordinance may be in conflict with state law even where there is no direct conflict, if the state has fully occupied the field of the legislation. There is no precise test of implied state preemption of a legislative field by the enactment of a comprehensive statutory scheme. The Supreme Court has stated, "In determining whether the Legislature intended to occupy a particular field to the exclusion of all local regulation, we may look to the 'whole purpose and scope of the legislative scheme' and are not required to find such an intent solely in the language used in the statute." (*In re Lane* (1962) 58 Cal.2d 99, 102-103 [22 Cal.Rptr. 857, 372 P.2d 897].) To guide us in making this determination, the Supreme Court has articulated three tests.

"*In re Hubbard, supra,* 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809], established three tests to determine whether a subject has been preempted by the Legislature. '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject

matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.'" (*Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 859-860 [76 Cal.Rptr. 642, 452 P.2d 930].)

The Mobilehome Residency Law, while covering some aspects of the relationship between mobilehome residents and mobilehome park owners, cannot reasonably be said to constitute a general and pervasive legislative scheme for the regulation of all aspects of mobilehome parks and residents. There is also no basis for concluding that the legislation shows a legislative intent to make the subject of mobilehome parks immune from local legislation. As was said by the court in *Gluck* v. *County of Los Angeles* (1979) 93 Cal.App.3d 121, 133 [155 Cal.Rptr. 435]: "The common thread of cases is that if there is a significant local interest to be served which may differ from one locality to another then the presumption favors the validity of the local ordinance against an attack of state preemption." The variety of local conditions that affect mobilehome parks in general, and the rents to be charged their residents in particular, make the notion of state preemption in this field less than appealing. In our view, under all applicable tests, the claim of state preemption made here fails.

The order granting a preliminary injunction is reversed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied May 24, 1983, and respondent's petition for a hearing by the Supreme Court was denied July 20, 1983.