Opinion
 

 BENKE, Acting P. J.
 

 In this case we consider the remedies available to mobilehome park tenants when the owners of the park raise the tenants’ rent in retaliation for the tenants’ efforts to obtain relief from earlier rent increases.
 

 As we explain in greater detail below, the victims of a retaliatory rent increase, including the tenants of mobilehome parks, are entitled to recover punitive damages under Civil Code
 
 [2]
 
 section 1942.5. Moreover, because the punitive damages available under section 1942.5 are limited by the terms of the statute, they may be imposed without regard to the landlord’s net worth. We also conclude that under section 1942.5 tenants are not required to vacate their premises in order to recover punitive damages for imposition of a retaliatory rent increase and that under the statute the trial court was required to award some of the successful tenants the attorney fees they incurred. .
 

 Because the trial court’s rulings did not permit the tenants to recover all the amounts permitted under the statute, we reverse the judgment in part and remand the case for further proceedings.
 

 I
 

 Factual and Procedural Summary
 

 The material facts which give rise to the tenants’ claims occurred in late 1980 and early 1981. The tenants
 
 [3]
 
 were all residents of the Rancho Carlsbad Mobilehome Park (Rancho Carlsbad) which was owned by Western Land & Development Company (Western), a partnership. Defendants and appellants Ronald S. Schwab and David F. Dawes were Western’s general partners.
 

 In response to a 13 percent rent increase noticed by Western in 1980, the tenants at Rancho Carlsbad sought relief from the Carlsbad City Council.
 
 *809
 
 The council prevailed upon the tenants and Western to enter into an agreement to arbitrate the reasonableness of the rent increase. The arbitration agreement was executed on February 25, 1981. Nonetheless on March 2, 1981, Western mailed the tenants notice of yet another rent increase, in the amount of $80 a month, commencing on May 1, 1981.
 

 The tenants vigorously contested the reasonableness of the 1980 rent increase as well the March 2, 1981, $80 increase. Eventually, the tenants were successful in establishing that the rent increases were not reasonable and they obtained a judgment against Western, Schwab and Dawes in the amount of the excessive rent.
 

 In this proceeding, which was separate from the litigation in which they contested the validity of the rent increases, the tenants brought a class action in which they alleged, among other causes of action, that the March 1981 rent increase was imposed in retaliation for their efforts to obtain relief from the earlier rent increase.
 

 Trial was conducted in two phases commencing in 1991. In the initial phase, a jury determined the March 1981 rent increase was in fact imposed in retaliation for the tenants’ opposition to the earlier rent increase. In the second phase of the trial conducted in 1996, after an intervening bankruptcy proceeding initiated by Dawes, a second jury determined that 423 tenants had left Rancho Carlsbad as a result of Schwab’s and Dawes’s conduct and had suffered a total of $1.7 million in compensatory damages.
 

 The jury also imposed against Schwab $1,000 in punitive damages for each of the 653 tenants who had suffered the $80 rent increase. However, following the jury’s verdict the trial court refused to award any punitive damages to the 230 tenants who had stayed at Rancho Carlsbad notwithstanding the rent increase. The trial court also refused to award the tenants any of their attorney fees. Thereafter, a judgment against Schwab and Dawes was entered.
 

 Schwab, Dawes and the tenants each appeal from the judgment.
 

 II
 

 Discussion
 

 A.
 
 Retaliatory Eviction
 

 Before reaching the various contentions of the parties, we believe it will be helpful to briefly set out the origins of the retaliatory eviction doctrine
 
 *810
 
 which, in the end, is at the heart of the tenants’ claims against Schwab and Dawes.
 

 In
 
 Barela
 
 v.
 
 Superior Court
 
 (1981) 30 Cal.3d 244, 249 [178 Cal.Rptr. 618, 636 P.2d 582]
 
 (Barela),
 
 the Supreme Court stated: “The retaliatory eviction doctrine is founded on the premise that ‘[a] landlord may normally evict a tenant for any reason or for no reason at all, but he may not evict for an improper reason. . . .’ [Citation.]
 

 “The affirmative defense of retaliatory eviction was first recognized by this court in
 
 Schweiger
 
 v.
 
 Superior Court
 
 [(1970)] 3 Cal.3d 507 [90 Cal.Rptr. 729, 476 P.2d 97], There, the statutory ‘repair and deduct’ provision (§ 1942) was construed so as to include protection against eviction for those tenants who exercised their statutory rights. The same year, the Legislature codified this protection in section 1942.5. The statute prohibited landlords from evicting a tenant in retaliation for the tenant’s exercise of the right to repair and deduct or the tenant’s complaint to the authorities about housing code violations.”
 

 In
 
 Aweeka
 
 v.
 
 Bonds
 
 (1971) 20 Cal.App.3d 278, 281 [97 Cal.Rptr. 650]
 
 (Aweeka),
 
 the court held that not only may a tenant use retaliation as a defense to an unlawful detainer action, a tenant may also allege an affirmative cause of action for retaliatory eviction. In
 
 Aweeka
 
 the tenants gave notice to the landlord that unless repairs to their apartment were made, they would deduct the cost of the repairs from their rent. In response the landlord almost doubled their rent. After they were unsuccessful in obtaining an injunction against enforcement of the rent increase, the tenants voluntarily vacated the premises. In finding that a common law cause of action for retaliatory eviction existed on these facts, the court stated: “We can discern no rational basis for allowing such a substantive defense while denying an affirmative cause of action. It would be unfair and unreasonable to require a tenant, subjected to a retaliatory rent increase by the landlord, to wait and raise the matter as a defense only, after he is confronted with an unlawful detainer action and a possible lien on his personal property.”
 
 (Id.
 
 at p. 281; see also
 
 Glaser
 
 v.
 
 Meyers
 
 (1982) 137 Cal.App.3d 770, 776 [187 Cal.Rptr. 242]
 
 (Glaser).)
 

 In 1979 the Legislature repealed section 1942.5 and reenacted it with amendments. (Stats. 1979, ch. 652, §§ 1, 2, pp. 2005-2006.) Among the amendments was an express prohibition against retaliation by way of an increase in rent and express protection of tenants who have “lawfully organized or participated in a lessees’ association or an organization advocating lessees’ rights or has lawfully and peaceably exercised any rights under the law.” (§ 1942.5, subd. (c).)
 

 
 *811
 
 Importantly, and consistent with the earlier holding in
 
 Aweeka,
 
 the 1979 legislation added subdivisions (f) and (g) to section 1942.5 and therein created statutory rights of action against landlords who unlawfully retaliate against their tenants. Those subdivisions provide as follows: “(f) Any lessor or agent of a lessor who violates this section shall be liable to the lessee in a civil action for all of the following:
 

 “(1) The actual damages sustained by the lessee.
 

 “(2) Punitive damages in an amount of not less than one hundred dollars ($100) nor more than one thousand dollars ($1,000) for each retaliatory act where the lessor or agent has been guilty of fraud, oppression, or malice with respect to such act.
 

 “(g) In any action brought for damages for retaliatory eviction, the court shall award reasonable attorney’s fees to the prevailing party if either party requests attorney’s fees upon the initiation of the action.”
 

 By way of the 1979 enactment of section 1942.5, the Legislature also stated in subdivision (h): “The remedies provided by this section shall be in addition to any other remedies provided by statutory or decisional law.”
 

 In sum then, tenants who are the victims of retaliatory conduct by their landlords have complementary rights of action both in the common law and under the statutory scheme adopted by the Legislature. (See
 
 Barela, supra,
 
 30 Cal.3d at p. 251;
 
 Glaser, supra,
 
 137 Cal.App.3d at p. 776.) With this background in mind we turn to the various contentions of the parties.
 

 B.
 
 Schwab’s Appeal
 

 On his appeal, Schwab contends alternatively that section 1942.5 does not provide protection to mobilehome park residents and that even if it did provide such protection, that protection has been preempted by the more specific provisions of the Mobilehome Residency Law (MHRL) (§798 et seq.). We reject both of these contentions.
 

 1.
 
 Section 1942.5, Subdivisions (c) and (f)
 

 The first time this case was before us we accepted, without discussion, the proposition that section 1942.5 applies to leases of mobilehome park spaces.
 
 *812
 
 (See
 
 Rich
 
 v.
 
 Schwab
 
 (1984) 162 Cal.App.3d 739, 743-744 [209 Cal.Rptr. 417].) We also note that in
 
 Glaser, supra,
 
 137 Cal.App.3d at page 773, the parties and court made a similar assumption.
 

 Nonetheless in his first argument on appeal, Schwab contends that because he was not in the business of renting dwellings, he was not subject to liability under section 1942.5, subdivision (c). Two important principles of statutory interpretation conflict with this argument: the requirement we consider first and foremost the plain meaning of a statute and the requirement that “ 1 “A statute must be construed ‘in the context of the entire statutory system of which it is a part, in order to achieve harmony among the parts.’ [Citation.]” ’ ”
 
 (Unzueta
 
 v.
 
 Ocean View School Dist.
 
 (1992) 6 Cal.App.4th 1689, 1695 [8 Cal.Rptr.2d 614].)
 

 By their terms, subdivisions (c) and (f) of section 1942.5 give a right of action to any
 
 lessee
 
 who has been subjected to an act of unlawful retaliation. Thus, on its face the statute provides protection to mobilehome park tenants who own their own dwellings and merely rent space from their landlord.
 

 In attempting to avoid the plain meaning of section 1942.5, Schwab relies on the fact that section 1942.5 is part of chapter 2 of division 3, part 4, title 5 of the Civil Code and that section 1940, subdivision (a), which is the first provision in chapter 2, states: “Except as provided in subdivision (b), this chapter shall apply to all persons who hire dwelling units located within this state including tenants, lessees, boarders, lodgers, and others, however denominated.” Subdivision (b) then goes on to exclude from the provisions of chapter 2 hotel operators who are subject to transient occupancy taxes or who provide traditional hotel services. Subdivision (c) in turn provides a broad definition of dwelling unit.
 

 One difficulty Schwab faces in persuading us that section 1940, subdivision (a), restricts application of chapter 2 to the lessees of dwelling units is that by its terms this provision
 
 does not exclude
 
 any types of leases, but merely expressly
 
 includes
 
 dwelling units. Admittedly, an inference of exclusion might arise from the express inclusion of dwelling unit leases and the failure to include other types of leases. However, the Legislature was apparently aware of this potential inference and dealt with it directly in subdivision (d) of section 1940 which states: “Nothing in this section shall be construed to limit the application of any provision of this chapter to tenancy in a dwelling unit unless the provision is so limited by its specific terms.” This provision makes it unambiguous that the various protections set
 
 *813
 
 forth in chapter 2 are not limited to leases of dwelling units but rather apply to all leases unless a particular statutory provision, by it own terms, is limited to dwelling units. Thus, read together and taken in their ordinary sense, subdivisions (a), (b) and (d) of section 1940 provide that all the provisions of chapter 2 apply to leases of dwelling units and, unless specifically limited to such leases, apply to all other types of leases as well. This plain reading of section 1940 is of course consistent with a plain reading of section 1942.5, which, as we have seen, by its terms applies to all leaseholds.
 

 Our reliance on the plain meaning of the statutes is supported by consideration of the inexplicable results which would be compelled by adoption of Schwab’s interpretation of section 1940. In particular, we note that section 1943 is also part of chapter 2. By its terms, section 1943 provides a presumed month-to-month tenancy for leases of
 
 “other than lodgings and
 
 dwelling-houses.” (Italics added.) Section 1944 provides a different presumption as to the term of residential leases. Plainly, the presumption set forth in section 1943 would have no operative effect if section 1940 were interpreted to mean the provisions of chapter 2 only apply to leases of dwelling units. We of course are required to avoid a construction which leads to a such disharmony in the statutory system set forth in chapter 2 of division 3, part 4, title 5 of the Civil Code. (See
 
 Unzueta
 
 v.
 
 Ocean View School Dist., supra,
 
 6 Cal.App.4th at p. 1695.)
 

 2.
 
 Section 798 et seq.
 

 In 1978 the Legislature enacted the MHRL (Stats. 1978, ch. 1031, § 1, p. 3178) incorporating protection it had initially provided mobilehome tenants in 1975. (Stats. 1975, ch. 146, § 1, p. 280.) In enacting the MHRL, the Legislature expressly found “that, because of the high cost of moving mobilehomes, the potential for damage resulting therefrom, the requirements relating to the installation of mobilehomes, and the cost of landscaping or lot preparation, it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the provisions of this chapter.” (§ 798.55, subd. (a).)
 

 The MHRL provided mobilehome owners unique protection by requiring they be given greater notice of rent increases and other changes in the terms of their tenancy and by limiting the circumstances under which they may be evicted. (§§ 798.30, 798.55.) Contrary to Schwab’s argument on appeal, no provision of the MHRL conflicts with the remedies provided by section 1942.5.
 

 
 *814
 
 In particular, the extended notice of eviction required by section 798.55 in no sense excludes application of the general prohibition against retaliatory action by landlords found not only in section 1942.5, subdivision (c), but also in the common law. Rather, in light of the Legislature’s express statement as to the vulnerability of mobilehome owners, the notice protection provided by the MHRL must be read as supplementing, rather than limiting, the rights of mobilehome owners.
 

 Our conclusion as to the supplementary nature of the rights created by the MHRL is of course consistent with those cases which have upheld the validity of local mobilehome rent control ordinances against claims that they were preempted by the MHRL. (See
 
 King
 
 v.
 
 Mobilehome Rent Review Bd.
 
 (1989) 216 Cal.App.3d 1532, 1538-1539, fn. 2 [265 Cal.Rptr. 624];
 
 Palos Verdes Shores Mobile Estates, Ltd.
 
 v.
 
 City of Los Angeles
 
 (1983) 142 Cal.App.3d 362, 374 [190 Cal.Rptr. 866]
 
 (Palos Verdes).)
 
 As the court in
 
 Palos Verdes
 
 stated: “The Mobilehome Residency Law, while covering some aspects of the relationship between mobilehome residents and mobilehome park owners, cannot reasonably be said to constitute a general and pervasive legislative scheme for the regulation of all aspects of mobilehome parks and residents.” (142 Cal.App.3d at p. 374.)
 

 Our conclusion is also consistent with the holding in
 
 Palmer
 
 v.
 
 Agee
 
 (1978) 87 Cal.App.3d 377 [150 Cal.Rptr. 841]
 
 (Palmer).
 
 In
 
 Palmer
 
 the court held the eviction requirements set forth in the MHRL control over the less stringent requirements of the unlawful detainer law. (87 Cal.App.3d at pp. 383-384.) Plainly, the holding that mobilehome owners receive more, rather than less, protection than other lessees supports our conclusion that the MHRL does not limit any of the rights otherwise provided mobilehome tenants by statute or the common law. Indeed, as the court in
 
 Palmer
 
 noted: “ ‘It has long been the rule in this State that statutes relating to the same subject matter are to be construed together and harmonized if possible.’ [Citation.] In other words, ‘. . . it is not to be presumed that the legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear by either express declaration
 
 or by necessary implication.’ ” (Id.
 
 at p. 383.)
 

 C.
 
 Dawes’s Appeal
 

 As Schwab’s partner, Dawes may ultimately be held liable for the punitive damages imposed on Schwab. Accordingly, on appeal Dawes argues the punitive damages imposed on Schwab must be set aside. Relying on the holding in
 
 Adams
 
 v.
 
 Murakami
 
 (1991) 54 Cal.3d 105, 114 [284 Cal.Rptr.
 
 *815
 
 318, 813 P.2d 1348]
 
 (Murakami),
 
 he contends the award of punitivos was defective because the tenants made no showing at trial as to Schwab’s financial condition.
 

 In
 
 Murakami
 
 the Supreme Court found punitive damages under section 3294
 
 [4]
 
 are designed to deter wrongful conduct, not leave the defendant financially ruined. (54 Cal.3d at p. 112.) “Because the quintessence of punitive damages is to deter future misconduct by the defendant, the key question before the reviewing court is whether the amount of damages ‘exceeds the level necessary to properly punish and deter.’ ”
 
 (Id.
 
 at p. 110.) Accordingly, “the absence of evidence as to financial condition ‘frustrates a meaningful appellate review of punitive damage awards (i.e., of whether the award was “grossly disproportionate”), since the absence of evidence of net worth precludes an appellate court from deciding whether an award might, for example, bankrupt the defendant.’ ”
 
 (Id.
 
 at p. 114.) Thus, the court in
 
 Murakami
 
 held that no award of punitive damages under section 3294 may be sustained in the absence of evidence of a defendant’s financial condition.
 

 
 *816
 
 Contrary to Dawes’s argument, the holding in
 
 Murakami
 
 does not apply to the punitive damages assessed against Schwab. As the tenants point out, the amounts assessed against Schwab were awarded under the specific provisions of section 1942.5, rather than under the general provisions of section 3294 discussed in
 
 Murakami.
 
 Of particular importance in considering the holding in
 
 Murakami
 
 is the fact that the amount of punitive damages available under section 1942.5 may be no less than $100 and no more than $1,000 for each violation when the elements of malice, oppression or fraud are present. The minimum and maximum levels of punitive damages set by the Legislature place the punitive damages awarded here in the distinct category of a statutory penalty or statutory damages. (See
 
 Beeman
 
 v.
 
 Burling
 
 (1990) 216 Cal.App.3d 1586, 1598-1599 [265 Cal.Rptr. 719]
 
 (Beeman).)
 

 Under section 3294, “. . . the judge or jury, as the case may be, has ' the authority to decide whether and what amount of punitive damages should be awarded. [Citation.] In contrast, statutory damages are set by a legislative body; while the fact finder must still determine
 
 whether
 
 such damages are to be awarded, if they are granted the amount is fixed by statute. Statutory damages may either take the form of penalties, which impose damages in an arbitrary sum, regardless of actual damages suffered or, as in the instant case, may provide for the doubling or trebling of the actual damages as determined by the judge or jury. [Citation.] Thus, while both exemplary damages and statutory damages serve to motivate compliance with the law and punish wrongdoers, they are distinct legal concepts, one of which is entrusted to the factfinder, the other to the Legislature.”
 
 (Beeman, supra,
 
 216 Cal.App.3d at pp. 1597-1598; see also
 
 People
 
 v.
 
 Morse
 
 (1993) 21 Cal.App.4th 259, 272, fn. 21 [25 Cal.Rptr.2d 816].)
 

 Where, as here, the Legislature has set the level of punishment which may be imposed for a particular act, the doctrine of separation of powers limits the nature of our review when such a penalty has in fact been imposed. We are required to “ ‘accord “substantial deference” to legislative judgments concerning appropriate sanctions for the conduct at issue.’ ”
 
 (BMW of North America, Inc.
 
 v.
 
 Gore
 
 (1996) 517 U.S. 559, 583 [116 S.Ct. 1589, 1603, 134 L.Ed.2d 809].) As with any other statute, we may interfere with the Legislature’s determination of what is required by the public interest only when there is no rationale basis for the decision reached by Legislature.
 
 (Horezcko
 
 v.
 
 State Bd. of Registration
 
 (1991) 232 Cal.App.3d 1352, 1358 [284 Cal.Rptr. 149].) (5c) Here, the maximum potential penalty for each violation, $1,000, is in no sense disproportionate to the annual rent collected on typical commercial, residential or agricultural leaseholds covered by the terms of section 1942.5 or disproportionate to the public interest in deterring retaliatory conduct by landlords. Given the relatively low limit imposed and the
 
 *817
 
 well-established public interest in regulating real property leases, we are in no position to add any general requirement that a tenant also show the financial condition of his landlord before the penalties authorized by section 1942.5, subdivision (f), may be imposed. Presumably, the Legislature considered the potential impact on landlords in setting the very specific monetary parameters which exist in the statute.
 

 We hasten to add that where, as here, the penalties imposed amount to several hundred thousand dollars, some consideration of their cumulative impact on a landlord might be warranted. However, in the context of a statutory penalty, the issue of defendant’s financial condition will at most be a matter for the defendant to raise in mitigation. (See, e.g.,
 
 State of California
 
 v.
 
 City and County of San Francisco
 
 (1979) 94 Cal.App.3d 522, 530-531 [156 Cal.Rptr. 542], holding that once evidence of statutory violation is presented, defendant bears the burden of establishing court should impose less than statutory maximum.) Here, no such mitigating evidence was offered on Schwab’s behalf.
 

 D.
 
 Tenants’ Appeal
 

 1.
 
 Punitive Damages for Nonmoving Tenants
 

 As we have noted, 230 Rancho Carlsbad tenants did not move following the March 1981 retaliatory rent increase. Rather, they paid the disputed rent increase and received a separate judgment in 1992 for the excessive rent they had paid. Although the jury awarded these class members $1,000 each in punitive damages, the trial court found that because they had not moved, they were not entitled to collect punitive damages. The trial court erred in doing so.
 

 By its terms, section 1942.5, subdivision (f)(2), does not require that a tenant move or be evicted to collect punitive damages. All the face of the statute requires is that a plaintiff be the victim of a retaliatory act in violation of section 1942.5. Importantly, “[s]ection 1942.5 is a remedial statute aimed at protecting tenants from certain types of abuses. It is to be ‘liberally construed to effect its objectives and to suppress, not encourage, the mischief at which it was directed. [Citation.]’ [Citation.]”
 
 (Barela, supra,
 
 30 Cal.3d at p. 251.) Given the remedial nature of the relief provided by section 1942.5, it is difficult to imply in the law any requirement that tenants move as a prerequisite to an award of punitive damages. Indeed such an implied condition would not act as the complete deterrent to retaliatory conduct the Legislature obviously intended in creating the statutory penalty.
 

 
 *818
 
 Each of the 230 nonmoving tenants was subjected to an act expressly prohibited by section 1942.5, subdivision (c), a rent increase imposed in retaliation for bringing their grievances to the Carlsbad City Council, and each suffered damage by being compelled to pay excessive amounts of rent. Thus, nothing express or implied in the statute undermines the punitive damages awarded by the jury and the judgment must be modified to provide all the tenants with those damages.
 

 2.
 
 Attorney Fees
 

 Although the tenants requested attorney fees in their initial complaint, and although 423 of them established that they had moved because of the rent increase, the trial court nonetheless denied their request that attorney fees be awarded under section 1942.5, subdivision (g). In its judgment, the trial court found that none of the moving tenants had in fact been evicted within the meaning of the statute. We disagree.
 

 Section 1942.5 permits attorney fees in any action brought for “retaliatory eviction.” As we noted earlier in this opinion, before the Legislature created a statutory remedy, the court in
 
 Aweeka
 
 found that a retaliatory eviction cause of action arises at common law whenever a retaliatory rent increase causes a tenant to move. (Aweeka,
 
 supra,
 
 20 Cal.App.3d at p. 281.) Given the remedial purposes of the Legislature in creating a parallel statutory remedy, there is no basis upon which we can conclude that in making reference to a “retaliatory eviction” in section 1942.5, subdivision (g), the Legislature was referring to any narrower class of cases than previously recognized in
 
 Aweeka.
 
 (10) Indeed, “1 [i]t is a generally accepted principle that in adopting legislation, the Legislature is presumed to have had knowledge of existing domestic judicial decisions and to have enacted and amended statutes in the light of such decisions as have a direct bearing upon them. [Citations.]’ [Citations.]”
 
 (Estate of McDill
 
 (1975) 14 Cal.3d 831, 839 [122 Cal.Rptr. 754, 537 P.2d 874].)
 

 Thus, the tenants who left Rancho Carlsbad because of the rent increase were entitled to recover the attorney fees they incurred in bringing their action against Schwab and Dawes; on remand the trial court will have to determine the amount of those fees.
 

 3. -6.
 
 *
 

 
 *819
 
 Disposition
 

 The judgment is modified to provide the 230 nonmoving tenants with the punitive damages awarded by the jury; the judgment is reversed insofar as the trial court denied the tenants who moved their attorney fees under section 1942.5, subdivison (g). In all other respects, the judgment is affirmed. Tenants to recover their costs of appeal.
 

 Haller, J., and McDonald, J., concurred.
 

 A petition for a rehearing was denied May 27, 1998, the petition of defendants and appellants for review by the Supreme Court was denied July 22, 1998.
 

 [2]
 

 All further statutory references are to the Civil Code.
 

 [3]
 

 Plaintiffs and appellants Irving J. Rich, John S. Temple, Ed L. Tucknies, John W. Felker and Robert A. Swanson (collectively the tenants)
 

 [4]
 

 Section 3294 provides: “(a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant. “(b) An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation. “(c) As used in this section, the following definitions shall apply: “(1) ‘Malice’ means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others. “(2) ‘Oppression’ means despicable conduct that subjects a person to cruel and unjust hardship in.conscious disregard of that person’s rights. “(3) ‘Fraud’ means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury. “(d) Damages may be recovered pursuant to this section in an action pursuant to Chapter 4 (commencing with Section 377.10) of Title 3 of Part 2 of the Code of Civil Procedure based upon a death which resulted from a homicide for which the defendant has been convicted of a felony, whether or not the decedent died instantly or survived the fatal injury for some period of time. The procedures for joinder and consolidation contained in Section 377.62 of the Code of Civil Procedure shall apply to prevent multiple recoveries of punitive or exemplary damages based upon the same wrongful act. “(e) The amendments to this section made by Chapter 1498 of the Statutes of 1987 apply to all actions in which the initial trial has not commenced prior to January 1, 1988.”
 

 *
 

 See footnote 1,
 
 ante,
 
 page 803.