Opinion
 

 HALVONIK, J.
 

 This is an action by the state for civil penalties against the City and County of San Francisco for pollution of state waters. The pollution occurred during a public employees’ strike in March of 1974. The jury awarded $500,000 to the state, the court reduced that amount to $150,000 and held that appellant unions, by virtue of indemnification, were liable for the entire amount. When making the indemnification
 
 *525
 
 ruling the court stated that, the law permitting, it would have apportioned liability between the city and the unions.
 

 All parties appeal. The state contends that the court abused its discretion by requiring the state to remit $350,000. The city contends that, contrary to the trial court’s ruling, the California Water Code imposes a maximum penalty of but $10,000 per day, and that, therefore, even the reduced award was too high. The city also contends that the burden of proof was erroneously allocated. The unions argue that there should be no indemnity and that the city should carry the entire burden because it was an active participant in the injury.
 

 The Facts
 

 Four public employee unions, representing clerical workers, hospital workers, janitors and social workers struck the City of San Francisco in March of 1974. The sewage treatment operators did not go on strike but when the sewage plants were picketed on Friday, March 8, they honored the picket line.
 

 The city decided against operating the plants with supervisors, giving as its reason the dangers of excess chlorination. Although a strike four years earlier had closed the plants for a short time with the consequence that 80 million gallons of raw sewage had been discharged into the bay, the city had no contingency plan for operating the plants in the event of a strike. San Francisco was no better at improvisation than it had been at planning. The city decided not to recruit people to assist in the operating of the plants, maintaining that it feared sabotage; and it did not ask the strike committee to exempt the plants except for a request that one operator remain at the plants as a precaution against flooding and combustible gas. This sole requested exemption was granted.
 

 The city’s Director of Public Works, Myron Tatarian, decided to close all four sewage plants, although he knew that the shutdown would result in the discharge of over 100 million gallons of raw sewage into San Francisco Bay and the ocean. State officials learned of the city’s intention to close the sewage treatment plants on March 8, 1974, and that day obtained a court order directing the city to keep them open. The plants, however, were not kept open and during the next six days untreated sewage in amounts estimated at 426,470,000 gallons were dumped into the bay and ocean. The amount of sewage solids in the discharge was
 
 *526
 
 496.000 pounds, grease and oil was discharged in the amount of 137,000 pounds and the amount of matter creating biological oxygen demand was 388.000 pounds.
 

 Over the weekend, it was decided that the city could, after all, run the plants with supervisory personnel. At a meeting with state officials the city was told that the state was entertaining the notion of bringing in people to operate the plants. The city replied that it had a policy against strike breakers but that it could reopen the plants. On Tuesday the Richmond-Sunset and Northpoint plants were reopened and the Southeast and Airport plants were opened on Wednesday morning. The strike ended two days later on March 15.
 

 When the plants were not operating, raw sewage was deposited from one Richmond-Sunset outfall. The Southeast plant had four outfalls, Northpoint had two and the Airport had two. The regional board inspected the bay and ocean waters on the Monday following the shutdowns. There was visible discharge of sewage solids, odors, discoloration and turbidity (milkiness) at all sites. Samples of water showed coliform (waste material from colon of warm-blooded animals) levels over the permitted limit. Aerial photographs showed black discharge, floating sheen and numbers of scavenger birds.
 

 Marine life was harmed because chronium exceeded toxic levels. Testimony in the court below indicated that the sewage would have caused varieties of harm to fish and benthic organisms (those living near the bottom of the sea) although specific injuries were unknown. The city admitted the deleterious effects of the discharges. The sewage had a harmful effect on shellfish, fisheries and recreational use of the waters. San Francisco beaches were posted with warning signs, the San Mateo Office of Environmental Health posted Coyote Point beach and Oyster Point beach and the state posted quarantine of ocean beaches to Pacifica and of bay beaches to Foster City from the time of the strike until March 22, 1974. Three surfers, who did not know of the sewage discharges, became ill after surfing on March 11. Sales of fish dropped off during and after the strike.
 

 Neither the city nor the state incurred any clean-up costs after the strike. Clean-up was considered impractical and unnecessary and it was left to the natural tide action to flush and clean the area.
 

 
 *527
 
 On March 12, 1974, the state filed an amended complaint against the city and the striking unions. The state prayed for an injunction and for civil penalties not to exceed $10,000 for each day and each location at which sewage effluent had been discharged into the waters of California. The city answered on March 13, 1974, admitting the dumping of raw sewage, and filed a cross-complaint against the unions for indemnification of any liability incurred by it in the state’s action plus $500,000 compensatory damages and $500,000 punitive damages. The state dismissed the defendant unions and moved for a change of venue. The case was moved from San Francisco to Marin County.
 

 The unions moved for summary judgment and judgment on the pleadings on the ground that section 13385
 
 *
 
 penalties are punitive in nature and cannot be recovered from a city because Government Code section 818 provides that no punitive or exemplary damages may be obtained from public entities. After the trial court denied the motion, the Court of Appeal issued an alternative writ of mandate. The California Supreme Court ordered the cause transferred there to be heard with
 
 People
 
 ex rel.
 
 Younger
 
 v.
 
 Superior Court
 
 (a case involving section 13350 of the Water Code, arising from an oil spill in the Oakland Estuary (16 Cal.3d 30 [127 Cal.Rptr. 122, 544 P.2d 1322]).) The Supreme Court held that section 13385 liability promotes a compensatory purpose and that moneys awarded pursuant to it are not punitive damages within the meaning of Government Code section 818.
 
 (San Francisco Civil Service Assn.
 
 v.
 
 Superior Court
 
 (1976) 16 Cal.3d 46, 51 [127 Cal.Rptr. 131, 544 P.2d 1331].)
 

 The state’s action against the city was tried before a jury, with Justice Louis Burke presiding. After the state presented its case, the city rested without calling any witnesses. Justice Burke instructed the jury that section 13385 imposes strict liability and that the city had admitted that it discharged pollutants into the water, resulting in major environmental harm. He further instructed that the maximum amount of civil penalties under section 13385 was $ 10,000 for each day that sewage was unlawfully discharged into the water “from each separate plant or point of discharge.” The total number of outfalls multiplied by the number of days of discharge was 50, and the jury returned a verdict in the maximum amount possible, $500,000.
 

 
 *528
 
 The city and unions noticed intention to move for a new trial. Justice Burke ruled that the damages were grossly excessive and that he would grant the motion for a new trial, unless the state agreed to remit $350,000 of the award. Justice Burke then held a court trial between the city and the unions on the cross-complaint, admitting the evidence from the first case. He ruled that the unions were liable for the entire amount of penalty incurred by the city in the state’s action, but not for compensatory or punitive damages.
 

 The Limit of Liability
 

 The California Water Code implements the Federal Water Pollution Control Act. (§ 13370.) All discharge of pollutants is prohibited except as authorized by law. (§ 13376.) Violators are “subject to a civil penalty not to exceed ten thousand dollars ($10,000) for each day in which such discharge . . . occurs.” (§ 13385; see also 33 U.S.C. § 1319(b).) Since section 13385 places the maximum penalty at $10,000 a day and since the pollution here under consideration occurred for six days, it would seem to follow that the maximum penalty recoverable by the state is $60,000. But that, the Attorney General suggests, is a ham-handed reading, graceless and unsophisticated. The Attorney General contends, and the court below held, that the $10,000 penalty per day is modified by the word “discharge” and that the word “discharge” means “addition . . . from any point source,” thus providing a maximum penalty of $10,000 for each day of pollution from each point source which, under the facts of this case, explains the jury award of $500,000.
 

 The Attorney General’s construction is based on section 13373 and 33 United States Code section 1362. Section 13373 provides, in pertinent part, that “the terms . . . ‘discharge’ and ‘point sources’ as used in this chapter shall have the same meaning as in the Federal Water Pollution Control Act. . . .” 33 United States Code section 1362(12), (14) defines “discharge of a pollutant” as “any addition of any pollutant to navigable waters from any point source,” and defines “point source” as meaning “any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.” Thus, goes the argument, when the code speaks of no penalty to exceed $10,000 “for each day in which such discharge . . . occurs” it must be
 
 *529
 
 interpreted to mean no more than $10,000 for
 
 each point source on each day.
 
 Neither the bald reading of section 13385 nor the sophisticated reading of 33 United States Code section 1362 into section 13385 is, facially, unreasonable. In order to determine the correct interpretation, therefore, we must examine the legislative history of the acts.
 

 The legislative history of the state enactment is clear; it incorporates by reference the federal history for that is the only way that the words used in the state act can “have the same meaning as in the Federal Water Pollution Control Act.” (§ 13373.) An examination of the legislative history of the federal act convinces us that a maximum penalty of $10,000 per day was intended. Nothing in the legislative history indicates that the definitions contained in 33 United States Code section 1362 were designed to increase the amount of civil penalty beyond the “per day of violation” standard of 33 United States Code section 1319(d). The report of the House of Representatives, Committee on Public Works, states that the words “discharge of pollutants” and “any point source” were coupled in 33 United States Code section 1362(12) so that municipal waste treatment works would not be exempted from the act as they had been from the Refuse Act. (A legis. history of the Water Pollution Control Amendments of 1972, vol. 1, p. 812 (Jan. 1973).) In debate before the House of Representatives, Congressmen Mizell, Hammerschmidt and Gubser each stated that the maximum civil penalty being enacted was $10,000 per day.
 
 (Id.,
 
 at pp. 368-369, 404, 663.) And the Joint Explanatory Statement of the Conference Committee, following the House amendment which authorized, instead of requiring, the initiation of civil actions or criminal proceedings, states that civil “penalties cannot exceed $10,000 per day of violation. . . .” (1972 U.S. Code Cong. & Admin. News, p. 3809.)
 

 In short, nothing in the legislative histoiy of the Federal Water Pollution Control Act intimates that a penalty for $10,000 per day per violation was intended and all legislative history indicates, as 33 United States Code section 1319(d) and section 13385 say, that the maximum penalty is $10,000 per day regardless of the number of point sources.
 

 In concluding that the civil penalty cannot exceed $10,000 per day we find ourselves uncoincidentally in agreement with the decision in
 
 United States
 
 v.
 
 Detrex Chemical Industries, Inc.
 
 (N.D.Ohio 1975) 393 F.Supp. 735. That court was confronted with the identical question and held “that while a $10,000 per violation per day penalty would also tend to
 
 *530
 
 effectuate the Congressional enforcement purposes, the truly devastating impact of such a construction on business is not what Congress intended. Such a rule would tend more towards confiscation than mere deterrence. Had Congress intended a per violation unit for computation of penalties, the Court is of the opinion that it would have more clearly expressed such an intent.”
 
 (Id.,
 
 at p. 738.) The
 
 Detrex
 
 opinion and its discussion of. legislative history is not only internally persuasive, but, it is worth noting, the government did not appeal that decision and Congress, although it has since amended the Federal Water Pollution Control Act, has not changed the wording of 33 United States Code section 1319.
 

 The reasoning of the court in
 
 Detrex,
 
 moreover, meshes neatly with California law. Government Code section 818 provides that a public entity is not liable for “damages imposed primarily for the sake of example by way of punishing the defendant.” The construction sought by the Attorney General would, in many cases, place section 13385 in conflict with Government Code section 818 and the Supreme Court has expressly directed that the sections be read harmoniously.
 
 (San Francisco Civil Service Assn.
 
 v.
 
 Superior Court, supra,
 
 16 Cal.3d at p. 51.)
 

 Our holding that the city’s maximum liability is $60,000 makes it unnecessary to reach the question whether the trial court abused its discretion by reducing the award from $500,000 to $150,000. That the distinguished trial judge thought it prudent to reduce the amount so drastically, though, fortifies our conclusion that the rejected interpretation of section 13385 inevitably conflicts with Government Code section 818.
 

 Burden of Proof
 

 Section 13385 imposes a maximum penalty but mentions neither presumptions nor burdens of proof. The trial court ruled that once plaintiff had proved that there had been a discharge in violation of the Water Code it became defendant’s burden to establish, by a preponderance of the evidence, that the amount of penalty imposed should be less than the maximum.
 

 The city complains that this ruling violated Evidence Code section 500: “Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting.” Evidence Code section 500, however, does not settle the question. The issue is whether it is
 
 *531
 
 essential to the claim to prove a loss in dollar amounts before recovering a civil penalty. Penalties are designed to deter as well as compensate. A penalty statute presupposes that its violation produces damage beyond that which is compensable. Furthermore, Evidence Code section 500’s exception for situations “otherwise provided by law” includes more than statutory law. “The term ‘law,’ of course, encompasses judicial decisions as well as legislative enactments. (Cf. Evid. Code, § 160.)”
 
 (Hawkins
 
 v.
 
 Superior Court
 
 (1978) 22 Cal.3d 584, 594 [150 Cal.Rptr. 435, 586 P.2d 916].)
 

 The courts of this state have traditionally altered the burden of proof in exceptional cases where the effectuation of public policy requires it. (See Witkin, Cal. Evidence (2d ed. 1966) § 198.) This is clearly such a case. Section 13385 would have virtually no deterrent effect if the polluter were penalized only when the plaintiff could demonstrate quantifiable damage because “water pollution . . . results in severe unquantifiable damage.”
 
 (San Francisco Civil Service Assn.
 
 v.
 
 Superior Court, supra,
 
 16 Cal.3d 46, 51.) The recreational and aesthetic values undermined by water pollution are real enough but they are not easily reduced to monetary terms. Pollution also profoundly affects the environment in a manner and to a degree not obvious or easily measurable. The effect of pollutants on the food chain is illustrative; “Aquatic invertebrates feed on small organisms called plankton. The invertebrates are in turn eaten by higher forms—fish and other animals—that are sources of food for human beings. This is, of course, a simplified description of the awesome, precarious natural process called the food chain, which is so delicate that the severance of any link could ruin it. But the links are even more fragile than this. When contaminants are passed up the food chain there is a tendency for the poisons to concentrate in geometric orders of magnitude. That is, relatively innocuous quantities of non-biodegradable, fat-soluble organic pollutants concentrated in plankton-sized beings can combine in lethal quantities in higher forms of life.” (Zwick & Benstock, Water Wasteland (1971) p. 18; and see Westman,
 
 How Much Are Our Nature’s Services
 
 Worth? (1977) 197 Sci. 960; Note,
 
 Assessment of Civil Monetary Penalties for Water Pollution: A Proposal for Shifting the Burden of Proof Regarding Damages
 
 (1979) 30 Hastings L.J. 651; Note,
 
 Environmental Protection and the Role of the Civil Money Penalty: Some Practical and Legal Considerations
 
 (1975) 4 Envt’l. Aff. 323.)
 

 The burden of demonstrating that its pollution of the bay and ocean was of a magnitude less than the liquidated damages provided for in
 
 *532
 
 section 13385 was properly placed with the city. The city introduced no evidence in mitigation of damages and is, therefore, liable in the amount of $10,000 for each day in which it violated the Water Code.
 

 Indemnification
 

 The evidence amply supports the conclusion that both the city and the unions were culpable for the unconscionable pollution of the bay and ocean. The trial court held the unions totally responsible as indemnifiers but noted that, if the law were different, “the court would divide the indemnity amount and would require the city to assume a portion of it.” In
 
 Safeway Stores, Inc.
 
 v.
 
 Nest-Kart
 
 (1978) 21 Cal.3d 322 [146 Cal.Rptr. 550, 579 P.2d 441], the California Supreme Court held that apportionment among joint tortfeasors on a comparative fault basis is appropriate whether they be strictly liable defendants or negligent defendants. The apportionment of liability between these defendants is, therefore, consonant with the law. Since the issue was noted below, no undue surprise or unfairness will result from a remand for the purpose of an apportionment based on comparative fault
 
 (Id.,
 
 at p. 333).
 

 The judgment is reversed with directions to enter a judgment in favor of the state in the amount of $60,000 plus any interest and trial costs; the case is remanded for further proceeding consistent with the views expressed herein on the issue of indemnification; each party to bear its own costs on appeal.
 

 White, P. J., and Feinberg, J., concurred.
 

 A petition for a rehearing was denied July 27, 1979, and the petitions of plaintiff and appellant and of defendants and appellants for a hearing by the Supreme Court were denied August 29, 1979. Manuel, J., did not participate therein.
 

 *
 

 Unless otherwise noted, all statutory references are to the Water Code.