[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION AFTER HEARING IN DAMAGES
This action, filed on January 15, 1997, seeks enforcement of Department of Environmental Protection pollution abatement Order No. SRD-071 ("the order"). Pursuant to General Statutes § 22a-432, that order was imposed upon to the defendant Cadle Properties of Connecticut, Inc. (Cadle Properties) on June 14, 1996 regarding its property located at 51 Albany Turnpike in Canton, Connecticut ("the site"). The soil and groundwater at this site have been contaminated with industrial solvents. The Commissioner of Environmental Protection seeks the assessment of civil penalties against the defendant, whom it alleges to have violated both the order and General Statutes § 22a-134 et seq., known as the Transfer Act in connection with this property. The Commissioner also seeks injunctive relief requiring the defendant to comply with the order. The defendant contests its liability for civil penalties or equitable relief. For the reasons set forth below, the court finds this matter in favor of the plaintiff Commissioner.
The history of this file reflects that on February 17, 2000, a finding of default was entered against Cadle Properties after the court granted the defendant's third counsel permission to withdraw from the case on January 24, 2000. At the subsequently scheduled hearing in damages, the defendant's fourth counsel filed an appearance in this matter. The defendant did not file a Motion to Set Aside the Default pursuant to Practice Book § 17-42.[1] Furthermore, the defendant did not file a CT Page 16345 Notice of Defenses within the time period allowed in Practice Book §§17-34[2] and 17-35.[3] Absent such a notice, the defendant is not entitled to have the trier of fact consider evidence for the purpose of contradicting any of the allegations in the plaintiff's complaint, except such as relating to the amount of damages. In this case, the issue of damages related to the requested assignment of civil penalties and equitable obligations. Practice Book § 17-34.
The hearing in damages commenced on April 12, 2000, and proceeded through eight days of both lay and expert testimony, and the presentation of voluminous documentary exhibits. Counsel for both parties submitted lengthy and detailed post-trial briefs, addressing multiple issues of law and fact. Oral argument was delivered on July 24, 2000.
 I. FACTUAL BASIS FOR DECISION
Based upon the evidence received at trial, the court makes the following findings of fact:
The defendant Cadle Properties is an Ohio corporation, registered to do business in the State of Connecticut, but maintaining a principal place of business at 4363 LaFrance Street, Newton Falls, Ohio. Daniel Cadle (D. Cadle) holds the office of president of Cadle Properties. In the fall of 1994, through procedures described below, Cadle Properties acquired ownership of a 1.7 acre parcel of commercial property at 51 Albany Turnpike, Canton, Connecticut. The site is zoned for commercial use, and has been leased to a retail car dealership in recent years.
Between approximately 1951 and 1972, the J. Swift Chemical Company, Inc. ("Swift"), who then owned the site, engaged in the business of recycling spent industrial solvents for resale and/or reuse. Swift's owners are all deceased. In 1969 or 1970, Swift caused the contamination of the real property at the site by dumping spent industrial solvents in this location. Those solvents, which constituted hazardous waste materials, contained the compounds Tetrachloroethylene, Trichloroethylene and Xylene. The DEP's first record of the discharge of solvents at the site was in 1978. J. Swift Chemical Company discontinued this business by 1972.
On November 28, 1978, the Department of Environmental Protection ("DEP") issued a pollution abatement order to Auto World Realty, Ltd., who owned and utilized the site after Swift, operating a retail operation for the sale of automobiles.[4] In due course, this order was recorded on the land records in the Town of Canton. Subsequently, on September 23, 1986, Auto World conveyed the site to Gianfranco Galluzzo. Thereafter, on January 26, 1989, as the result of the continued CT Page 16346 contaminated condition of the site, the DEP issued Order No. HM-568 to Galluzzo. This order also was recorded on the land records for the Town of Canton. Galluzzo did not comply with the order. Thereafter, the DEP nominated the site for inclusion upon Connecticut's superfund priority list for environmentally hazardous properties, because the site was deemed to have significant contamination and to represent an unacceptable risk to the public health and welfare.
In 1990, in the face of Galluzzo's noncompliance, the DEP had expended state finds and arranged for engineering consultants to conduct a remedial investigation and feasibility study concerning the status of the real property at this site. Final reports related to this work were submitted to the DEP in December 1993. To explicate the results of this investigation and study at trial, and to opine concerning the effects of the nature and extent of the unremediated contamination at the site, the plaintiff produced the testimony of Paul Jameson, an environmental analyst with an extensive background in physical geography and geology who had been employed by the DEP for approximately eleven years, and Elsie Patton, an expert hydrologist, who has been employed by the DEP for approximately nineteen years.[5]
Through the cogent and credible testimony of Patton and Jameson, the plaintiff established that the primary contaminants remaining in the soil and groundwater at the site were found to be the industrial solvents known as Tetrachloroethylene, also known as Perchloroethylene, Trichloroethylene and Xylene. In the early 1990's, tests performed at the site yielded reliable data concerning the presence of these toxic chemical compounds in both the groundwater and the soil at that location. The groundwater at the site registered concentrations of Tetrachioroethylene at levels up to 80,000 parts per billion: the drinking water standard for that compound is a maximum level of 5 parts per billion. The soil at the site registered concentrations of Tetrachioroethylene at levels up to 1,000 parts per million: the residential direct exposure criterion, which is the applicable soil standard for that compound, is 12 parts per million. Tetrachloroethylene and Trichloroethylene are both cancer-causing compounds that pose a risk to persons using the property and coming into direct or indirect contact with the soil containing these contaminants or with the water that has been exposed to the contaminants.
Patton's credible and consistent expert testimony established that every time it rains, water dissolves a portion of the contaminants that have aggregated and remain in the soil at the site, causing these cancer-causing compounds to seep into the water table, where the additional contaminants migrate to other properties.[6] The "plume," or flow of groundwater at this site, has not reached equilibrium during the CT Page 16347 passage of time since the late 1970's. Non-aqueous chemical components remain in place, permitting downgrade migration of the environmental toxins upon exposure to rainwater. There are few physical or geographical barriers to the downgrade migration of these toxins from the site. The chemical solvents are present at higher concentrations deeper into the groundwater flow system, than at more shallow levels, mandating regular monitoring through soil and water sampling at various depths. As the groundwater below the site moves to other locations, additional sampling is required to ensure accurate data concerning the condition of the environment.[7]
The evidence thus establishes that Cadle Properties' inaction permitted contaminated soil to remain at the site, causing or allowing an additional mass of contaminants to enter the groundwater flow system every time it rains; maintenance of that condition continues to cause a discharge of pollutants into the waters of the state. The cost for cleaning up soil contamination is a small fraction of the amount necessary to clean groundwater. As Patton explained, although to the naked eye asphalt pavement may appear to be impervious to rainwater, this substance does not act as a barrier to the entry of precipitation into the ground, nor to the infiltration of contaminants into the sub-surfaces of and adjacent to the paved area.
The evidence disclosed that the groundwater in the area of the Canton site has been designated by the DEP as having "GA" classification. A GA classification means that water is to be maintained at a quality suitable for drinking without treatment regardless of whether the groundwater is actually used for drinking at the present, and indicates that the water must be preserved as a drinking water resource for the future.
Public water services had been extended to homes in the vicinity of the site in 1980. After the investigation in 1990, public water was extended to four additional homes whose residential wells were impacted by infiltration and contamination from the site. Currently, there are no known households receiving their drinking water from wells which are subject to pollution from the site. However, other residential wells have been identified down gradient of the site, which are at clear risk of contamination through the groundflow process, although they are not now known to be contaminated.
The DEP had brought suit against Galluzzo to secure compliance with its outstanding order, to procure reimbursement of the costs expended on the investigation and remediation study, and to see that civil penalties were assessed against this landowner. On May 15, 1997, the court entered a judgment in favor of the Commissioner and against Gianfranco Galluzzo in the case known as Commissioner of Environmental Protection v. GianfrancoCT Page 16348Galluzzo, Superior Court, judicial district of Hartford, Docket No. CV 94-0544168. This court has acknowledged the orders for compliance, reimbursement, and penalties issued by M. Hennessy, J. through the memorandum of decision in Commissioner of Environmental Protection v.Gianfranco Galluzzo. Galluzzo has never complied with those orders.
In October of 1994, while suit was pending against Galluzzo, Cadle Properties had completed arrangements to obtain ownership of the site. A quitclaim deed[8] dated October 31, 1994 and recorded on November 4, 1997, in favor of the defendant, indicated the formal passage of title on the property from Galluzzo to Cadle Properties.[9]
Thereafter, on June 14, 1996, the DEP issued pollution abatement Order No. SRD-071 to the defendant Cadle Properties of Connecticut, Inc.,[10]
pursuant to General Statutes § 22a-6, § 22a-424 and §22a-432.[11] This order was directed at the prior contamination upon the site, which was a matter of public knowledge as a result of the orders which had been entered upon the land records for the Town of Canton in 1978 (Auto World) and 1989 (Galluzzo). Cadle Properties had advised the DEP that it planned to respond to the order by August 10, 1996. However, although both Cadle Properties, through its general counsel, D. Cadle personally acknowledged receipt of Order No. SRD-071, the defendant never requested a hearing on the matters and therefore the order became final thirty days after its issuance, pursuant to General Statutes § 22a-436.
The DEP and D. Cadle discussed the remediation of the site.[12] The DEP told D. Cadle that any remediation at the site must be done in accordance with the requirements of Order No. SRD-071 and that D. Cadle should consult with a professional environmental engineering consultant who should, in turn, communicate with the DEP. Cadle Properties never notified the DEP that it had hired an appropriate consultant to perform an investigation at the site or to plan and conduct remedial activities as required by the order. D. Cadle subsequently offered to have pavement applied to the site,[13] but did not tender any expert consultation or engineering references in support of this proposal to cure the contamination at issue. Neither the defendant nor D. Cadle ever presented the DEP with a proposal which included plans for ground water or soil sampling to monitor the contamination conditions at the site.
Order No. SRD-071 became final July 15, 1996. On January 15, 1997, contemporaneous to the submission of this lawsuit, the DEP applied for a prejudgment remedy in the amount of $270,000, intended to secure its anticipated verdict promoting enforcement of Order No. SRD-071. In response, on February 24, 1997, the court ordered that any periodic payments due to the defendant by the tenant who had leased the Canton site CT Page 16349 for the operation of a retail car dealership, M S Gateway Associates, LLC (M S), should be held in escrow by the tenant's attorney.[14]
Cadle Properties has never complied with Order No. SRD, which is still outstanding and remained in effect at the time of this hearing.
The transfer of the site from Galluzzo to Cadle Properties was a "transfer of establishment as defined by General Statutes § 22a-134
(1).[15] Prior to the transfer of the property from Galluzzo to Cadle Properties, pursuant to the Transfer Act,[16] the defendant was required to certify[17] to the Commissioner of Environmental Protection that, to the extent necessary to minimize or mitigate a threat to human health or the environment, the defendant would contain, remove or otherwise mitigate the effects of any discharge, spillage, uncontrolled loss, seepage or filtration of hazardous wastes on-site in accordance with procedures and a time schedule approved by the commissioner pursuant to an order, stipulated judgment or consent agreement, pursuant to General Statutes § 22a-134a (c). The DEP's property transfer program, established to effectuate the provisions of the Transfer Act,[18]
received no filings from either Galluzzo or Cadle Properties in connection with the conveyance of the Canton site from Galluzzo to the defendant in the fall of 1994.[19] Public files, available at the DEP at the time of the transfer from Galluzzo to Cadle Properties, clearly indicated that the site was contaminated with Tetrachloroethylene, Trichloroethylene and Xylene as the result of Swift's original disposal of solvents containing these compounds. Accordingly, the defendant in this matter failed to comply with the certification requirements of § 22a-134 et seq.
New and additional investigations of the site, as required by Order No. SRD-071, would not duplicate the DEP investigation which was completed in the early 1990's, due to the enhanced capabilities of up-to-date environmental technology. A current examination would establish the extent of any further discharge from volatile compounds at the site, and would thereby enable accurate prognosis regarding the potential effect upon properties and waterways to which groundwater from the site will migrate. It is standard procedure for the DEP to issue subsequent orders requiring respondents to perform additional investigations and to perform remedial actions, in order to take advantage of improvements in technology and to obtain updated data concerning properties where contamination has been noted. Order No. SRD-071 does not require that the previous studies at the site be re-performed, but that regular investigatory updates be supplied to the agency by the defendant site owner.
Cadle Properties is entitled to make due use of the information recorded in the prior investigation.[20] Cadle Properties' utilization CT Page 16350 of studies already done to identify the nature and scope of contamination would reduce the defendant's costs of compliance with the order. Furthermore, since the time of the remedial investigation in the early 1990's, Remediation Standards Regulations have been enacted which require less restorative activity for this site than that which was expected at the time of the original remedial investigation.
The evidence presented at trial, through the credible and consistent testimony of Patton and Jameson, establishes that Cadle Properties' failure to comply with relevant legislation has caused a twofold impact upon human health and the environment in this state. First, as the result of these violations, polluted soil remains on the site as a potential health risk to people who have direct contact with the property. Second, the contaminated soil creates a continuous condition from which the remaining and consolidating contaminants existing on the site add more contaminants to the groundwater flow system every time it rains. The water which has been exposed to the site thus cannot be used safely for drinking, bathing, commercial or industrial purposes, due to recirculation of spent water. If the soil on the site were remediated to remove the extant solvents, the opportunities for further risk to human health from direct exposure to the solvents in soil and to solvents allowed to enter the groundwater flow system would be nearly extinguished.
Patton's credible testimony established that from November 1994 to the present, soil contamination at the site has increased the mass of contaminants in the groundwater of the state, as much of the property is permeable to rain water. Daniel Cadle's proposal to pave the unpaved portion of the site will not correct the pollution problem and does not serve as an acceptable remedial approach. Connecticut's Remediation Standards Regulations prohibit the use of a membrane and asphalt cap where there is an acceptable, alternative remediation method available. In this case, alternative remediation methods which are acceptable to the DEP and which meet state standards include using a soil vapor extraction method, or excavation of the contaminated soil. Cadle Properties' ownership of contaminated soils and its failure to comply with the abatement order constitutes maintenance of a condition that is in fact a source of pollution to the waters of the state.
The business of Cadle Properties is to hold title to the site in Canton, along with some other properties in Connecticut. The formation of Cadle Properties allowed a distinct corporate corporation to both own the Canton site,[21] and to collect rent from its tenant, MS.[22] From its formation in 1994 through 1997, Cadle Properties' federal income tax returns do not reveal that it compensated any employees or officers, nor that it acquired any income, notwithstanding the ostensible payment of CT Page 16351 rental fees by M S both before and after the entry of the prejudgment remedy. Cadle Properties had only de minimus reported income or expenditure of monies for compensation to employees in 1998 and 1999.
The evidence presented in this matter reflects that on August 6, 1993, the Fleet Bank mortgage which was held upon the Canton property by the prior owner, Gianfranco Galluzzo, was assigned to and assumed by an entity known as The Cadle Company.[23] The Cadle Company is in the business of buying and/or servicing promissory notes and distressed properties from banking institutions. Both the Canton land records and records maintained by the defendant indicate that not Cadle Properties of Connecticut, but the separate entity known as The Cadle Company entered in the agreement for release of the mortgage on the site which had been held by Galluzzo. The evidence supports the reasonable and logical inference[24] that both The Cadle Company and Cadle Properties knew of the existence of significant environmental problems on this property, prior the time when The Cadle Company took over the Galluzzo mortgage from Fleet Bank, and prior to the transfer of the site from Galluzzo to Cadle Properties of Connecticut, Inc. However, there was no evidence presented to the court from which it could reasonably be concluded that the defendant Cadle Properties played any lawful or designated role in the release of Galluzzo's mortgage, as this act was performed by the distinct, separate entity known as The Cadle Company.
A current real estate appraisal of the site, which was performed at the direction and under the supervision of The Cadle Company,[25] estimated the market value of the site at $740,000.00, if the site was clean. The value of the property for leasing as an auto dealership was estimated to be $92,654.00 annually.
 II. THE EFFECT OF THE FEBRUARY 17, 2000 DEFAULT
As noted above, on February 17, 2000, a finding of default was entered against the defendant in this matter. It is axiomatic that "[a] default admits the material facts that constitute a cause of action . . . and entry of default, when appropriately made, conclusively determines the liability of a defendant. Ratner v. Willametz, 9 Conn. App. 565, 579,520 A.2d 621 (1987) . . . Skyler Ltd. Partnership v. S.P. Douthett Co., 18 Conn. App. 245, 253, 557 A.2d 927 [cert. denied, 212 Conn. 802,560 A.2d 98] (1989). . . . Voluntown v. Rytman, 27 Conn. App. 549, 557,607 A.2d 896, cert. denied, 223 Conn. 913, 614 A.2d 831 (1992)." (Internal quotation marks omitted.) Bank of America, FSB v. Franco,57 Conn. App. 688, 693, 751 A.2d 394 (2000). "Where there is a default judgment and nothing more, the cause of action and every element necessary to establish it are admitted, and all that remains is to fix the amount of damages." Kiessling v. Kiessling, 134 Conn. 564, 568, CT Page 1635259 A.2d 532 (1948).
The complaint dated January 15, 1997 alleges, among other things, that the defendant became the owner of the site on October 31, 1994; that Order No. SRD-071 was issued on June 14, 1996; that the defendant has failed to comply with the order; that as the transferee of contaminated property which qualifies as an "establishment" within the meaning of Connecticut's environmental laws, under the circumstances of this case, the defendant was obligated either to submit a negative declaration indicating the absence of environmental violations upon the site, or to certify to the Commissioner of Environmental Protection its intention to control the contamination, and that he did not do so, in violation of General Statutes § 22a-134a, the Transfer Act.
The legal effect of an entry of default in this case is the admission of all the facts alleged in the DEP's complaint, including those referenced above; a finding of liability in favor of the plaintiff; and a judgment for civil penalties if they are found to be appropriate under the existing circumstances. Applying this analysis to the present case, the default is the equivalent of an admission that Cadle Properties failed to comply with Order No. SRD-071, and that the defendant in fact violated § 22a-134a.[26] The defendant is liable for violation of pollution abatement Order No. SRD-071 from July 15, 1996 to the present day. The defendant is further liable for violation of the Transfer Act in connection with its receipt of the property from the prior owner in November 1994.
Accordingly, because the defendant's liability has been established, the court is now limited to determining the amount and nature of any civil penalties, fines, or equitable relief that should be awarded. See,e.g., Boyce v. Donahue, Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. 171017 (February 28, 2000,Karazin, J.).
 III. THE ROLE OF § 221-452b IN DETERMINING OF CIVIL PENALTIES
The defendant claims that the court is constrained from awarding civil penalties which exceed the limitations established through General Statutes § 22a-452b.[27] The plaintiff counters that the value of the property at 51 Albany Turnpike does not, as a matter of law, serve as a determining factor in the assessment of appropriate civil penalties for the defendant's violation of the environmental laws at issue. For the reasons stated below, the court finds that under the circumstances of this case, the fair application of § 22a-452b does not bar the court from imposing upon the defendant a civil penalty which exceeds the value of the contaminated property. Accordingly, the court finds this issue in CT Page 16353 favor of the plaintiff.
The fundamental objective of a court in interpreting statutes is to ascertain and give effect to the apparent intent of the legislature.Bittle v. Commissioner of Social Services, 249 Conn. 503, 507, 734 A.2d 551
(1999). The court will "presume that laws are enacted in view of existing relevant statutes and that [s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law." Id. Furthermore, "[i]n interpreting a statute, common sense must be used. . . . When two constructions are possible, courts will adopt the one which makes the [statute] effective and workable, and not one which leads to difficult and possibly bizarre results. . . ." (Quotation marks omitted; internal and external citations omitted.) Sweetman v. State Elections Enforcement Commission,249 Conn. 296, 307, 732 A.2d 144 (1999). In the instance where a statute, such as § 22a-452b, creates an exception to the general rule, the court must construe the exception so as not to extend the language beyond the evident intent of the statute. Kulis v. Moll,172 Conn. 104, 109-110, 374 A.2d 133 (1976). With these considerations in mind, the court will construe the environmental protection statutes which the Cadle Properties has violated, and the provisions of § 22a-452b
which the defendant claims shields it from any obligation to pay a penalty which exceeds the value of its property, "as a whole with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation." Fruin v. Colonnade One at Old Greenwich Ltd.Partnership, 237 Conn. 123, 130, 676 A.2d 369 (1996); see also Sweetmanv. State Elections Enforcement Commission, supra, 249 Conn. 307.
Although the defendant valiantly protests that the exemption provisions of § 22a-452b are applicable to this case, the clear language of the statute indicates that this legislation is inapposite to the dispute between the parties at bar. By its very terms, § 22a-452b establishes a factor to be used in determining whether a party shall be held liable
for environmental violations. As has been noted throughout this opinion, because the question of liability was resolved in favor of the plaintiff through the entry of the default against the defendant on February 17, 2000, that issue is not properly the subject of the court's attention in this hearing in damages. The language of the statute does not limit the amount of damages to be paid by one who is liable for noncompliance with a pollution abatement order. In this action, therefore, the statute does not have the effect, desired by the defendant, of mitigating civil penalties which may be assessed pursuant to § 22a-438 for violation of a pollution abatement order, or civil penalties assessed pursuant to § 22a-134d for violation of the Transfer Act.
Even if the court were to assume, however, that the statutory limit was CT Page 16354 appropriately raised by the defaulted defendant in this matter, the court nevertheless finds that Cadle Properties does not hold the status necessary to avail itself of the legislation's benefit. General Statutes § 22a-452b affords protection only to "a mortgagee who acquires title to real estate by virtue of a foreclosure or tender of a deed in lieu of foreclosure. . . ." The evidence presented at the hearing in damages clearly establishes, however, that Cadle Properties has never been a mortgagee on this site.[28] The Cadle Company was the primary mortgagee who purchased the mortgage instrument from Fleet Bank, according to the documents recorded on the land records. Those records, and the evidence presented at the hearing, establish that it was The Cadle Company, not the defendant, which released the mortgage held by Gianfranco Galluzzo. Although Cadle Properties acquired the property by virtue of an instrument that purports to be a quitclaim deed, Cadle Properties has been, at all times pertinent to this matter, a corporate entity separate and distinct from that of the mortgagee, The Cadle Company. The defendant Cadle Properties had never held an interest in the site that could be perfected through a foreclosure upon default of the mortgage terms. Thus, Cadle Properties cannot put itself in the position of a party who may be protected by § 22a-452c, as it is not, and has never been, amortgagee which has taken the property at 51 Albany Turnpike in Canton by virtue of a foreclosure.[29]
For the foregoing reasons, the court finds that the defendant may not take advantage of the exemption set forth in § 22a-452b.
 IV. DEP's ENFORCEMENT OF ORDER No. SRD-071
The defendant argues that the DEP has acted improperly by making it the object of the enforcement actions presented in this lawsuit. As prior owners have been the subject of similar administrative violations, but have not been prosecuted through the civil justice system, the defendant claims that the Commissioner has engaged in selective prosecution[30]
which is not justified in law or equity. For these reasons, the defendant maintains that it should not be obligated to pay any penalties in this matter. The plaintiff claims that is that it has appropriately sought the imposition of penalties to be paid by the defendant under the circumstances of this case. The court finds that the defendant is indeed eligible for the imposition of civil penalties and, accordingly, finds this matter in favor of the plaintiff.
The defendant has argued that the plaintiff's enforcement actions against it, as a subsequent owner of contaminated property, violates constitutional protections against selective prosecution. "The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is essentially a direction that all persons similarly CT Page 16355 situated should be treated alike. . . . A violation of equal protection by selective [treatment] arises if: (1) the person, compared with others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. The claimant has the burden of proving a selective enforcement claim." (Internal quotation marks omitted; internal and external citations omitted.)Cadlerock Properties v. Commissioner, 253 Conn. 661, 670, ___ A.2d ___
(2000).[31]
In the present case, the defendant does compare its treatment to the treatment afforded to some of the other owners of the property, who were not prosecuted for environmental violations, including Swift or any of Swift's successors and Auto World. The defendant concedes that the DEP prosecuted Galluzzo, but argues that the state never effectuated the judgment it obtained on May 15, 1997 against this adjudicated violator. Assuming, however, that the defendant had satisfied the first prong of the selective enforcement test, the defendant did not present any credible evidence to prove that the enforcement decision was based on an impermissible consideration "such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Cadlerock Properties v. Commissioner, supra,253 Conn. 670. Our Supreme Court has recently affirmed that the DEP "does not abuse its discretion by issuing an abatement order against a current property owner regardless of the owner's culpability for the pollution ofthe property." (Emphasis added.) Id. "Whether the DEP could have or should have prosecuted other parties responsible for the pollution on the site; unquestionably, the Commissioner is authorized to pursue any party, like the plaintiff who maintains the site. Where the legislature has specifically empowered the Commissioner with such authority, it is inappropriate for the court to rewrite the statute to require a different process and result." Cadlerock Properties Joint Venture, L.P. v.Commissioner of Environmental Protection, et al, Superior Court, Docket No. CV 980492629S, judicial district of New Britain (May 5, 1999,McWeeney, J.), aff'd, 253 Conn. 661, 670, ___ A.2d ___
(2000). This is especially so following the Supreme Court's earlier decision in Starr v. Commissioner of Environmental Protection;236 Conn. 722, 675 A.2d 430 (1996); which has clearly established the liability of a successor property owner for present environmental violations which accrued during previous ownership. See Cadlerock Properties Joint Venture, L.P. v. Commissioner ofEnvironmental Protection, et al, Superior Court, Docket No. CV 980492629S, supra. Accordingly, any claim by the defendant that the state should be prevented from enforcing Order No. SRD-071 or seeking appropriate civil penalties for four years violation of that order is not CT Page 16356 supported by our law.
The defendant has presented no reference to relevant jurisprudence or legal theory which sufficiently supports its position to overcome the recently reiterated that a current site owner is subject to lawful prosecution for historical environmental violations. Cadlerock Propertiesv. Commissioner, supra, 253 Conn. 670. Accordingly, any claim by Cadle Properties that the Commissioner should be prevented from enforcing Order No. SRD-071 or seeking appropriate civil penalties for the four years of violations that occurred during the defendant's ownership of the site cannot be sustained.
 V. EFFECT OF PRIOR JUDGMENT FOR ENVIRONMENTAL VIOLATIONS
The defendant claims that it is insulated from any obligation to pay civil penalties based upon the environmental violations persisting at the site, because the Commissioner has already obtained a judgment against another party, Gianfranco Galluzzo, for like cause. The plaintiff claims that he is not seeking duplication of the penalties sought from Galluzzo, but that his claims have been limited to those for which Cadle Properties is temporally responsible, and which have not yet been the subject of compliance. Although no appellate level Connecticut court has specifically addressed this issue, the court finds that the existing interpretations of the Water Pollution Control Act, General Statutes § 22a-416 et seq.,[32] support the conclusion that a subsequent owner of contaminated property may be held responsible for abating pollution where there is an outstanding judgment in place against a former owner, so long as that judgment has not been fulfilled. Accordingly, the court finds this issue in favor of the plaintiff.
The starting point is the oft-repeated principle that environmental statutes are remedial in nature and should be liberally construed to accomplish their purpose. Manchester Environmental Coalition v.Stockton, 184 Conn. 51, 57, 441 A.2d 68 (1981); Carothers v.Capozziello, supra, 215 Conn. 122. It has been noted that at the time of its enactment in 1967, legislators referred to the Connecticut Water Pollution Control Act as "a declaration of war against water pollution."Starr v. Commissioner of Environmental Protection, supra, 226 Conn. 376. The Water Pollution Act "arose from the ashes of several previous failures to arm the agency charged with enforcing Connecticut's statutes designed to combat water pollution with adequate powers and procedures to solve the state's pollution problems." Id., 378.
The court next notes that the prior judgment at issue, rendered in the case of Commissioner of Environmental Protection v. Gianfranco Galluzzo,
supra, Superior Court, judicial district of Hartford, Docket No. CV CT Page 16357 94-0544168, did not specifically replicate this action brought to enforce a pollution abatement order.[33] The decision in Commissioner v.Galluzzo allowed the plaintiff to recover costs expended by the state for the remedial investigation and feasibility study at the Canton site pursuant to the state superfund program, General Statutes § 22a-133 et seq. Other remedies established through Commissioner v. Galluzzo included the assessment of penalties for Galluzzo's violation of General Statutes § 22a-427 and § 22a-430, for causing the pollution at issue, and for Galluzzo's violation of the Transfer Act in his purchase of the property, in violation of General Statutes § 22a-134, et seq. The trial court in the Galluzzo case also ordered injunctive relief requiring the defendant to clean up the site. The Commissioner in the instant action is not seeking recovery of previously expended costs, nor is he seeking to enforce the provisions of § 22a-427 or § 22a-430. The only portion of the Galluzzo judgment which overlaps the DEP's present action is the similar scope of the injunctive relief requested. However, the defendant has provided insufficient legal authority for the support of his proposition that the injunction against Galluzzo, requiring the cleanup of the site, acts to bar the state from seeking an injunction against Cadle Properties requiring it to comply with Order No. SRD-071, which, although it also requires cleanup of the site, is clearly an environmental order separate and apart from Order No. HM-568, which had been issued against Galluzzo.
Existing environmental legislation clearly anticipates that a subsequent property owner, such as Cadle Properties, may be the subject of enforcement orders notwithstanding concomitant liability of the prior owner. The language of General Statutes § 22a-432, the authority for Order No. SRD-071 against Cadle Properties, provides that "any person . . . maintaining any facility or condition which reasonably can be expected to create a source of pollution to the waters of the state" may be the subject of a pollution abatement order issued by the Commissioner. (Emphasis added.) Clearly, the term "any" is not exclusive, but inclusive of any persons who have an ownership in contaminated property. Furthermore, through General Statutes § 22a-6a, the legislature has established joint and several liability for the various owners of property on which environmental violations are identified, by establishing that "[w]henever two or more persons knowingly or negligently violate any provision of . . . section . . .22a-424 to 22a-433, inclusive . . . or any regulation, order or permit adopted or issued thereunder by the commissioner and responsibility for the damage caused thereby is not reasonably apportionable, such personsshall, subject to a right of equal contribution, be jointly and severallyliable under this section." (Emphasis added).[34] The language of either statute contains absolutely no limitation on the responsibility of an owner of property whose prior owner is the subject of an outstanding CT Page 16358 judgment requiring the cleanup of the site and/or the payment of civil penalties. So long as the contamination has not been addressed, pursuant to § 22a-432 and § 22a-6a, "any" subsequent owners will be "jointly and severally liable" for the cleanup, along with the prior owner who remains subject to the order of the court.
Additionally, support for the court's determination that the plaintiff is entitled to secure joint and several liability against subsequent owners for past environmental violations, notwithstanding the existence of a judgment against a prior owner, is found in the principle that a DEP pollution abatement order, such as those which have been recorded on the land records of the town of Canton regarding this site, constitutes notice to an owner, the owner's heirs, successors and assigns of public matters affecting the property. See General Statutes § 22a-434. A DEP pollution abatement order creates an interest that, to use the legal vernacular, "runs with the land." Connecticut National Bank v. Widen andHenderson Realty Company, et al., Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 225982 (November 18, 1985, Meadow,J.). As such, Cadle Properties was provided with due and appropriate notice of the DEP's interest in the Canton site, prior to the defendant's purchase of this contaminated site.
It is clear from the evidence that the defendant took ownership of the site with full knowledge of its contamination.[35] The Connecticut Supreme Court has stated that passive ownership of contaminated property renders the owner liable. "In light of the remedial purposes of the [Water Pollution Control] act, we conclude that the legislature intended that the word maintaining' in § 22a-432, be interpreted liberally toinclude within its purview a landowner who has failed to abate pollutionexisting on his or her land that reasonably could be expected to create a source of pollution to the state's waters regardless of blame for the creation of the condition." (Emphasis added) Starr v. Commissioner ofEnvironmental Protection, supra, 226 Conn. 382. See also New York v.Shore Realty Corp., 759 F.2d 1032 (2d Cir. 1985) (current owner of facility from which there is a release of hazardous substances is liable under CERCLA [the federal Comprehensive Environmental Response, Compensation and Liability Act] although it never operated the facility.)
Based upon all of these factors, the court concludes that despite the insistence of the defendant's argument, there is no legal basis for relieving Cadle Properties of responsibility for existing violations of a current DEP order, merely because a judgment exists against a former owner of the site. Cadle Properties is the subject of the present action because of its violation of Order No. SRD-071, not because of the acts or omissions of prior owners. As such, our law recognizes this defendant, a CT Page 16359 subsequent owner of the site, as an appropriate party to a DEP enforcement action. Cadlerock Properties v. Commissioner, supra,253 Conn. 670.
As to Order No. SRD-071, the court concludes from the evidence that defendant's violation of that order was knowing and intentional.[36]
Allowing the defendant to evade liability for abating pollution, after it violated the Transfer Act while still obtaining ownership of the property, and while is has avoided effective compliance with the order, would not achieve the legislative purpose of effectuating cleanup of the contaminated properties in this state. Under all the circumstances here presented, the defendant must be held fully responsible for the remediation of the contaminated conditions on its property, regardless of the existence of an unperfected judgment against Galluzzo.
 VI. BASIS FOR ASSESSING CIVIL PENALTIES AND OTHER RELIEF
Although the defendant's liability for the statutory violations set forth in the plaintiff's complaint has been established by the entry of the default, it still falls to the court to determine whether the court should award the equitable relief requested by the plaintiff. The court must also decide whether a penalty is due and, if so, what type and extent of a penalty should be imposed. In so doing, the court must consider the evidence related to the violations thus established. The court finds its authority to impose civil penalties in this matter within the text of General Statutes § 22a-438. This legislation provides, in pertinent part, that "[a]ny person who . . . violates any provision of this chapter . . . shall be assessed a civil penalty not to exceed twenty-five thousand dollars, to be fixed by the court, for each offense. Each violation shall be a separate and distinct offense and, in case of a continuing violation, each day's continuance thereof shall be deemed to be a separate and distinct offense. . . . In determining the amount of any penalty assessed under this subsection, the court may
consider the nature, circumstances, extent and gravity of the violation, the person['s] . . . prior history of violations, the economic benefit resulting to the person . . . from the violation, and such other factors deemed appropriate by the court. The court shall consider the status of a person . . . as a persistent violator." (Emphasis added.)
Generally, penalties are designed to discourage violators from continuing or repeating violations and dissuade others from violating the law. Student Public Interest Research Group of New Jersey, Inc. v. ATTBell Laboratories, 617 F. Sup. 1190, 1201 (D.N.J. 1985). For purposes of calculating civil penalties, other courts have followed the well-reasoned algorithm that directs the tribunal to first determine the maximum penalty to be assessed, then to adjust that figure based upon the CT Page 16360 factors applicable to a particular case. Atlantic States LegalFederation, Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1137, 1142 (11th Cir. 1990). See also PIRG v. Powell Duffryn Terminals, Inc.,720 F. Sup. 1158, 1163-64 (D.N.J. 1989), rev'd on other grounds,913 F.2d 64 (3rd Cir. 1990); United States v. SCM Corp., 667 F. Sup. 1110,1126 (D.Md. 1987); Chesapeake Bay Foundation v. Gwaltney of Smithfield,Ltd., 611 F. Sup. 1542, 1556 (E.D.Va. 1985); aff'd., 791 F.2d 304 (4th Cir. 1986), vacated on other grounds, 484 U.S. 49, aff'd and remanded in part on other grounds, 844 F.2d 170 (4th Cir. 1988); and California v.City and County of San Francisco, 94 Cal.App.3d 522, 530,156 Cal.Rptr. 542, 546-47 (1979). This court has adopted that meritorious step-by-step procedure in deciding the penalty aspect of this case.
Where a court is charged with the responsibility for assessment of penalties in a case involving environmental violations, such as this, it is appropriate to attempt to satisfy two policy goals: (1) deterrence and (2) fair and equitable treatment of the regulated community.[37]Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd., supra,611 F. Sup. 1557; see also Carothers v. Capozziello, 215 Conn. 82, 103,574 A.2d 1268 (1990). The former goal serves a primary policy consideration of the statutes enacted to regulate and thereby preserve the safety and security of our environment. See Chesapeake Bay Foundationv. Gwaltney of Smithfield, Ltd., supra, 611 F. Sup. 1557. Civil penalties operate to achieve environmental compliance by deterring and discouraging future violations.[38] PIRG v. Powell Duffryn Terminals,Inc., supra, 720 F. Sup. 1166. The latter consideration, focusing upon fairness, is necessarily entwined with the first, and acts to adjust the deterrence figure by attempting to account for such factors as the violator's degree of willfulness, good faith, ability to pay, degree of cooperation with the regulators, and other factors specific to the violation or the case. Id.
The Connecticut Supreme Court has set forth general factors for a trial court to consider in a case based upon violations of environmental statutes and regulations, when determining what civil penalty is appropriate under the applicable scheme for protection of Connecticut's environment.[39] "Those factors include, but are not limited to: (1) the size of the business involved; (2) the effect of the penalty or injunctive relief on its ability to continue operation; (3) the gravity of the violation; (4) the good faith efforts made by the business to comply with applicable statutory requirements; (5) any economic benefit gained by the violations; (6) deterrence of future violations; and (7) the fair and equitable treatment of the regulated community." Carothersv. Capozziello, supra, 215 Conn. 103-04 (violation of environmental legislation regulating solid waste disposal). CT Page 16361
As noted, § 22a-438 (a) assigns civil penalties in response to the defendant's liability in this matter expressly establish that a penaltyshall be assessed for environmental violations. Section 22a-438 (a) identifies a number of factors that the court may consider in assessing a penalty. The court is permitted, under that statute, to "consider the nature, circumstances, extent and gravity of the violation, the person or municipality's prior history of violations, the economic benefit resulting to the person or municipality from the violation, and such other factors deemed appropriate by the court." § 22a-438 (a). However, despite the apparently mandatory language of General Statutes § 22a-438 noted above, a penalty assessment should also be accomplished through the informed discretion of the court using the factors set forth in Carothers v. Capozziello, supra. While some of the § 22a-438 (a) criteria overlap with those specified in Capozziello,
the section final reference to "other factors" enables the court to consider the Capozziello factors not already included in the statute, and the court will, accordingly, do so.
 VII. FACTORS FOR CONSIDERATION IN PENALTY DETERMINATION
In assessing the appropriate' penalty in response to the defendant's violations, the court finds that the gravity component, established byCarothers v. Capozziello, supra, represents the most applicable factor to use in measuring the degree of violation in this case. Accordingly, the court commences by determining the nature and extent of harm caused to the public health and the environment by Cadle Properties' persistent violations of the Water Pollution Act, and its violation of the Transfer Act. The court finds that the defendant failed to make a good faith effort to address the contamination on its property for a period of close to four years, notwithstanding its knowledge of the unremediated conditions at 51 Albany Turnpike in Canton[40] The court finds that the defendant's failure to undertake the appropriate cleanup created a serious, if unmeasured, impact upon human health and the environment in this state. Because the defendant did not comply with the cleanup order, every time it rained during the period alleged in the complaint, the contaminated soil existing on this site added more contaminants to the groundwater flow system. The polluted soil and groundwater remain in place, despite the DEP "s efforts at securing the remediation deserved by the citizens of this state. Carothers v. Capozziello, supra,215 Conn. 103-04.
As to the size of the business involved, other than the tax returns showing little or no income for Cadle Properties during the period in question, the court received insufficient evidence on which to base any conclusions concerning the implications of this factor for the determination of an appropriate penalty. Carothers v. Capozziello,
CT Page 16362 supra, 215 Conn. 103-04.
As to the effect of the penalty or injunctive relief on Cadle Property's ability to continue operation, the court notes the evidence presented through D. Cadle who indicated the continued existence of the real-property holding company, notwithstanding the fact that its rental income has been used in recent years to address the prejudgment remedy, and notwithstanding the fact that it has apparently elected to remain bound to a lease which provides it with approximately $40,000 less in annual income than would be expected for this property.[41] Id. As noted above, notwithstanding D. Cadle's protestations that his meeting and correspondence with DEP staff members indicated Cadle Properties' good faith effort to comply with applicable statutory requirements, the court has found that D. Cadle lacked the education or expertise necessary to fulfill the reasonable consultant criteria imposed through Order No. SRD-071, and that his proposal for paving the surface of the contaminated property would have been understood, by one knowledgeable in such matters, to be of insufficient character to remedy the contaminated conditions at the site. As such, the court finds that the evidence fails to support any reasonable inference that the defendant made good faith efforts toward reaching an amicable resolution of its contest with the DEP. Id.
As to any economic benefit gained by the violations, the court notes that Cadle Properties has, over the years since the issuance of Order No. SRD-071, been spared the cost of consultation and cleanup.[42]
There was insufficient evidence from which the court could conclude that this property would be unusable as a retail auto dealership even during the remediation: in fact, the evidence strongly suggested that with appropriate decontamination procedures in place, M S would still be able to conduct their business without interference of any measurable sort.[43] Id. Finally, the court finds that assignment of a penalty to Cadle Properties which is of such a nature that fully reflects the gravity of its violations will serve as an effective deterrent to those who may consider like violations in the future, and will demonstrate to those members of the regulated community who observe our environmental laws the wisdom of their ways. Id. Fair and equitable treatment of the regulated community demands that violators be punished, and that no penalty be born by those who comply with the spirit and letter of environmental legislation. See Student Public Interest Research Groupof New Jersey, Inc. v. ATT Bell Laboratories, supra, 617 F. Sup. 1201.
With respect to the penalty to be assessed against the defendant for violation of the Transfer Act, General Statutes § 22a-134 et seq., the court finds that there were two prior pollution abatement orders on the land records that provided notice to the defendant. The court further CT Page 16363 finds that the defendant's lease to M S acknowledges and provides for contingencies related to contamination of the site by toxic or hazardous substances.[44] These factors clearly indicate that the defendant was aware of the contamination of the property when the defendant acquired title. The court has considered this element of knowledge in determining the appropriate penalty for violation of the Transfer Act.
 VIII. DEFENDANT'S ABILITY TO PAY CIVIL PENALTIES
With respect to the defendant's actual payment of any penalties that may be levied in this matter, the court notes that the burden of establishing the inability to pay a penalty lies with the defendant. Even as the Connecticut Supreme Court has stated that "the trial court may place the burden of establishing mitigating financial circumstances" on the defendant, it is reasonable to place the burden of showing inability to pay civil penalties upon the defendant, as well.[45] See Keeney v.LS Construction, 226 Conn. 205, 217, 626 A.2d 1299 (1993). Applying this rubric to the present matter, the court concludes that it received insufficient evidence from which it could reasonably determine that the defendant was unable to pay any penalties that might be imposed here.
The defendant has presented credible affirmative proof that its assets are insufficient to pay a penalty. Other than D. Cadle's submission of Cadle Properties' 1998 and 1999 tax returns, the court received no documentation of the defendant's assets or accounts receivable. The trial court may place the burden of establishing mitigating financial circumstances on the defendant, especially where knowing statutory violations have been shown, as in this matter. Keeney v. LSConstruction, supra, 226 Conn. 216-217, citing Chesapeake Bay Foundationv. Gwaltney of Smithfield, supra 791 F.2d 315-16 and PIRG v. PowellDuffryn Terminals, Inc., supra, 720 F. Sup. 1165-66.
When presented with tax returns from the company's inception in 1994 through 1997, D. Cadle indicated that Cadle Properties had never had any income. However, as noted above, the property has been leased from November 1, 1995 to the present time, and Cadle Properties received income from the rents until the plaintiff garnished the rent in February or March 1997. The defendant's 1996 tax return, however, does not report the income from the rents. Since the defendant's 1996 tax return does not accurately reflect rental income to the company, this court cannot attribute give much weight to subsequent tax returns offered by Cadle Properties in its effort to show that the company is unable to pay any penalty that may be assigned in this matter.
The defendant's claim that its assets are insufficient to pay a penalty has not been supported by the evidence adduced at trial. Absent that CT Page 16364 proof the defendant has failed to meet its burden of "establishing mitigating financial circumstances" that should affect the court's determination of penalty in this matter.[46] See Keeney v. LSConstruction, supra, 226 Conn. 217.
 IX. PENALTY CALCULATION
The plaintiff has sought a civil penalty based upon the violations in the complaint established by the default and upon the evidence in the record after the hearing in damages. By default, the defendant has admitted that it was in violation of abatement Order No. SRD-071 and General Statutes §§ 22a-134, et seq., the Transfer Act commencing on July 15, 1996: the evidence at trial supports these determinations. The evidence presented at trial further establishes that these violations continued through the commencement of trial on April 12, 2000.[47] This period encompasses one thousand three hundred and sixty two (1362) days in all.
The maximum daily amount of the civil penalty for each day of non-compliance with Order No. SRD-071 would be $25,000, pursuant to § 22a-438 (a). The accumulated maximum penalty for violation of the order, during the time period in question, would thus be $34,050,000. The maximum penalty for a violation of the Transfer Act is $100,000, pursuant to § 22a-134d. Adding the maximum Transfer Act penalty to the accumulated maximum Order violation penalty, the total maximum penalty for the time period in question would thus be $34,150,000.
The plaintiff has requested that a total effective penalty of $2,734,000 be imposed upon the defendant.[48] Despite the persuasiveness of the plaintiff's arguments, the court finds that the penalty sought is, to a small degree, disproportionate to the degree of the defendant's violations, and not filly supported by the considerations defined in Carothers v. Capozziello, supra.[49] The court does find, however, that a very significant penalty should be imposed, based upon the gravity and persistence of the defendant's intentional violations of Order No. SRD-071 and of the Transfer Act.
Upon due consideration, the court finds the following to be an appropriate civil penalty for Cadle Properties' violations of Order No. SRD-071 and General Statutes §§ 22a-134, et seq., the Transfer Act:
For the knowing violation of the Transfer Act, the court finds the appropriate penalty to be $100,000.
For the long-standing violation of Order No. SRD-071, the court finds that a penalty of $1,500 per day for the entire period should be CT Page 16365 imposed, particularly in response to the gravity, persistence, and lack of good faith components of the violations as established throughCarothers v. Capozziello, supra. Thus, for a period consisting of 1362 days, the total accumulated penalty for violation of Order No. SRD-071 should be $2,043,000. This award represents some $32,007,000 less than the statutory maximum for the period in question.
The total adjusted civil penalty, adding the penalty for violation of the Order to the penalty for violation of the Transfer Act equals $2,143,000. The court finds that this adjusted civil penalty is both fair and reasonable under the circumstances, given the seriousness and nature of almost four years of the defendant's active violation of Order No. SRD-071 and the Transfer Act, adversely affecting the environment shared by the citizens of the state of Connecticut, and the Commissioner's ability to manage the state's water quality. General Statutes §22a-438; Carothers v. Capozziello, supra.
 X. ORDERS
WHEREFORE, based upon the foregoing law and the evidence presented at trial, having found that the defendant admitted the violation of the statute, and that the DEP has provided sufficient evidence to support a civil penalty which is reasonable but less than the maximum penalty, this court now ORDERS as follows:
1. The defendant, Cadle Properties of Connecticut, Inc., is ordered to immediately undertake any and all action necessary to comply with DEP Order No. SRD-071, and to promptly comply with that order in full.
2. The defendant, Cadle Properties of Connecticut, Inc., is prohibited from conveying any interest in the real property at issue until all contaminated soil and contaminated groundwater at the site has been filly remediated in compliance with DEP standards now in effect.
3. The defendant, Cadle Properties of Connecticut, Inc., is ordered to pay a civil penalty in the total amount of $2,043,00 for the defendant's non-compliance with the pollution abatement Order No. SRD-071 and $100,000 for violation of the Transfer Act. The total effective civil penalty equals $2,143,000.
4. All sums presently in escrow pursuant to the court's prejudgment remedy order of February 24, 1997, revised March 7, 1997, shall be paid to the Treasurer, State of Connecticut, through the Office of the Attorney General for the State of Connecticut, within thirty days of the court's decision, and these amounts shall be credited against the penalties assessed by the court. CT Page 16366
5. All additional lease payments during the term of the current extended lease between M S Gateway Associates, LLC and Cadle Properties of Connecticut, Inc. shall be paid to the Treasurer, State of Connecticut, through the Office of the Attorney General for the State of Connecticut, and shall be credited against the penalties assessed by the court.
BY THE COURT,
N. Rubinow, J.